## DAVE MEYERS v. THE STATE.

### No. 1796.    Decided June 15, 1898.

**1.  Murder—Manslaughter—Charge.**

On a trial for murder, where it appeared that defendant was the guest, so-called, of the proprietress of a bawdy-house, and that said proprietress had ordered deceased to leave the premises, which he refused to do, accompanied by insulting conduct, Held, this afforded no legal provocation to defendant, and the court did not err in refusing in the charge to submit the question of manslaughter predicated upon these facts.

**2.  Change of Venue.**

On a trial for murder, where, on a motion for change of venue, sixteen witnesses from different sections of the county all testified that the people, so far as heard from in the county, believed that defendant was guilty and ought to be punished, a great many stating he ought to be hanged; Held, the venue should have been changed, notwithstanding some of them stated they believed defendant could obtain a fair and impartial trial in the county,—there appearing no legal grounds for such conclusion or belief.

**3.  Same—"Prejudice"—Construction of Statute.**

The provisions of article 615, Code of Criminal Procedure, for change of venue when there exists so great a prejudice in the county against the accused as to render it improbable that he can obtain a fair and impartial trial, embraces both a prejudice against the accused and a prejudice arising from prejudgment of his case. Following Randle v. State, 34 Texas Criminal Reports, 43. HENDERSON, J., dissenting, contends that "prejudice," as contemplated by the statute, means personal spite or ill will; that is, prejudice which does not originate out of the case to be tried, but out of some other matter disconnected with the case; that it does not embrace opinions formed in regard to the guilt or innocence of the defendant. He insists, moreover, that the evidence adduced on the motion is insufficient to show an abuse of discretion by the court in overruling the motion, whether from personal prejudice or a prejudgment of the case.

APPEAL from the District Court of Milam.  Tried below before Hon. JOHN N. HENDERSON.

Appeal from a conviction for murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

The indictment in this case charged appellant with the killing of A. H. Jones, on the 14th day of January, 1894, by shooting him with a pistol.

This is a companion case to Meyers v. State, 37 Texas Criminal Reports, 208, in which this appellant was convicted of murder in the first

degree for the killing of W. A. Binkley, the punishment in that case being assessed at a life term in the penitentiary. The two killings occurred in the same transaction. After the homicide appellant sued out a writ of habeas corpus for bail, which having been denied him, he appealed, and this case is Ex Parte D. H. Meyers, 33 Texas Criminal Reports, 204. In this latter case the important facts pertaining to the two homicides will be found reported.

The following general concise resume of the facts is reproduced from appellant's brief in this appeal:

The general circumstances are that defendant, who was a resident of Cameron, was at the house of Emma Carleton, known as the "Blue Goose," on the night of the 14th of January, 1894, and arranged to spend the night with Emma Carleton, who was the proprietress of said house. Jones and Binkley and a number of other persons came to the house on the night in question and engaged in a general drinking bout, in which Binkley participated, but Jones did not drink excessively and was not intoxicated. Defendant and the woman Emma Carleton had not retired, and mingled with the visitors. Defendant was orderly and was not intoxicated. Binkley became very much inebriated, and was requested by the proprietress to leave the house, which he refused to do. His conduct was very boisterous and overbearing. Jones was quiet and was not guilty of any misconduct. Binkley and Jones were strangers at the house and in the town. They had visited the house some nights previous and had had some altercation, and on their visit on the night in question were unwelcome guests. About 12 o'clock at night all of the persons left the house except Emma Carleton and Clara Watson (who were the sole inmates), the defendant, and Binkley and Jones. A short time after this Binkley and Jones were again requested by Emma Carleton to leave the house, and refused to do so in a boisterous and insulting manner. The defendant was about retiring at this time, but went with Emma Carleton into the parlor, where Binkley and Jones were, and both Emma Carleton and the defendant requested them to leave. They refused to leave, and in the quarrel which ensued Emma Carleton addressed herself particularly to Jones and the defendant to Binkley. High words ensued, and at about this time the testimony becomes conflicting and confusing. A difficulty followed, and without undertaking to state the general particulars, the facts, as before stated, being confusing, it is sufficient to state that defendant fired his pistol and killed Binkley in the room, and also mortally wounded Jones, who died the next day. He was indicted for the murder, as before stated, of both Binkley and Jones.

In a foot note to his opinion, Presiding Judge Hurt directs that the testimony adduced on the motion for change of venue be reported. Without giving the questions and answers, I condense it as follows:

C. T. Leverett testified: Am assessor and collector of the city of Cameron, and have lived five years in the city and county. Know people from almost every section of the county. In addition to my official position, I am bookkeeper for Tom Peoples, and meet a great many people

every day from all over the county and from different portions of the county. Have heard the case of the State v. D. H. Meyers discussed, shortly after the occurrence, quite frequently by the people from the country as well as those in Cameron. In my opinion there is considerable prejudice against D. H. Meyers. I have heard no one say anything else than that they believed him guilty of the murder. Don't think I have ever heard anyone say they were inclined to sympathize with him. I know of no other cause than that of the killing from which there is prejudice against him. I think prejudice means when people had already made up their minds as to the guilt or innocence of a man. I think that is what it means in this case. Almost every man whom I have also heard express himself says that he believes the defendant guilty; and I have also heard men in town and other places say they thought he ought to be hung; have heard some say he ought to be lynched. Can not say that this is the general sentiment all over the county, but it is the sentiment of a majority of those whom I have heard express themselves. These discussions and expressions were mainly shortly after the occurrence. I have not heard the matter discussed right lately.

Cross-examined: I am also a bartender at Mr. Peoples' saloon. Have lived in Cameron since I have resided in the county (five years), except about six or eight months. Know people who live in the different sections of the county. Know people at Milano, Rockdale, Buckholtz, Ad Hall, Cameron, and other places. My acquaintance is not as general with people near Rogers, on or about the Bell County line. Am acquainted with the country in beat No. 5, though I can not pick out the lines of the beat. Have never been to Davilla. My acquaintance is limited at Lilac. Don't know that I can say what the general sentiment of the people at Lilac, Davilla, San Gabriel, or Shields' Gin is as regards this transaction. Don't know just where beat No. 8 in the county is. Have never been to Thorndale, except to pass through it on the train. Can't say I know the sentiment of the people over there, but a majority of the people from that section whom I have met have, in my judgment, a prejudice against defendant; at least they generally say they think he ought to be hung. Have been to Rockdale several times. Can't say I know the general sentiment there. Have not been in beat No. 3, at Gause, Milano, and that section lately. Have not been through the country much since this affair occurred, on the 14th of January last. Have probably met people from the section about Gause, Milano, and on the other side of the river every few days, and they express about the same sentiment that others have,—that defendant ought to be hung. Have not been at Baileyville, Branchville, Clarksville, and other places on the Brazos since this affair occurred. Can not say that I know positively the sentiment of the people over there. All I do know of it I would have to answer as I have the other questions. People that I have met from the country, as a general thing, are prejudiced against defendant, and I get this from hearing them talk about the killing, and from hearing them express themselves generally. I only know the general sentiment

of the people around Burlington, Lake City, Ben Arnold, and that section from what I have heard. I have been to Lake City since the killing; can't say that I know there is prejudice there, only from information from what I have heard others say discussing the question. The general opinion around Cameron, as far as I have heard it expressed, is that defendant is guilty, and the people in the country are of the same opinion so far as I have heard; and I have never heard many expressions of sympathy for Dave Meyers among them. I mean by prejudice in this case, that the people have already formed an opinion about it; that they say he is guilty of the killing; and I have heard some say he ought to be taken out and hung. I am unable to say how many qualified voters or jurors I have heard express themselves as before stated, but I have heard a great many. My opinion is, from what I know and hear of the case, that a great prejudice exists against defendant in this county. I am one of the compurgators to defendant's application for change of venue. I signed it believing defendant could not get a fair and impartial trial. I know of no person personally prejudiced against defendant in this case. I think some of the prejudice has grown out of the case, and some of it may be the cause of ill will towards defendant growing out of the case. I do not think the killing engendered ill will or grudge on the part of the people against defendant, but I know of some instances of personal ill will growing out of this case. On Sunday evening, after the killing, there was quite a crowd on the corner at Smith & Lawrence's store discussing the affair. Some expressed themselves that defendant ought to be taken out and hung, but I don't remember who it was. There was nothing indicating that there was going to be a lynching.

Dr. D. Monroe testified: Have lived in Milam County eighteen years. Lived in neighborhood of Yarrellton, in northern part of the county, ten miles from here, part of the time; the rest of the time have lived in Cameron. Am a physician; practice in Cameron and six or seven miles around in the country, and know a good many people in that radius around Cameron. Know nearly everybody around Lake City and Yarrellton. Am acquainted a little around Ad Hall and Buckholtz. Not much acquainted at Maysfield. Have heard this killing discussed but very little by people outside of Cameron. Shortly after the killing, and during the examining trial, I heard a good many expressions from people who live in Cameron,—expressions that would lead me to believe that they had already formed an opinion adverse to the defendant; and as far as I have heard people in the country, not exceeding three or four men, talking about the affair, it was not favorable to defendant. Conversations which I have heard were not at all favorable to defendant; they condemned the act and said they were sorry it happened, and that they were afraid of the consequences. Have not heard of any sympathy expressed for defendant in town. I have heard of nothing that you construe into ill will or prejudice, except that they have formed opinions and will express them. Have heard no expressions of personal animosity towards defendant, and what ought to be done with him.

J. W. Chenowith testified: Live in Cameron. Engaged in selling quilting frames. Have met a good many people from different places all over the county, and have heard this case discussed. Have heard a good many expressions, such as that he ought to be punished; and that he ought to be hung, and such as that; a good many said they were sorry that it happened, but that he ought to suffer for the act; and many times that he ought to be hung. Have not been in the country much; have been on one trip to Lilac; those I heard speak of the matter there spoke adversely to defendant. I have been also to Milano and Yarrellton. At those places the sentiment was adverse generally to defendant, as far as I know. They said he ought to be hung. I have lived in the county since last October; am not much acquainted with the people. Don't think I heard any talk about the case at Yarrellton. Outside the act of the killing, I have always heard the defendant well spoken of. I have heard some say they were sorry he had done so; that they were surprised at his actions. I have heard the case mostly discussed in town, but not mostly by town men. Men from different parts of the county would come to the store and mention the subject. I would tell them the facts, and they would invariably remark that such a man ought to be hung. From what I heard, there did not seem to be any prejudice against defendant before the killing.

Ben Harrell testified: Have lived near Jones Prairie, in northeast part of the county, since January, 1870. Most of the people I have heard say anything about the case say that defendant ought to be hung; that a man that would do such a thing as he did ought to hang. So far as I have heard anything about the matter, it has been adversely to defendant; and this is the general sentiment so far as I know. I have never heard anybody say that they had any prejudice against defendant, but it is the sentiment of the people that he ought to be hung, so far as I know.

M. M. Johnson testified: Have lived in Cameron over six years. Have heard the case generally discussed on the streets. I don't know of any prejudice against defendant specially; everybody seems to express themselves as sorry that the killing occurred. People say generally that he is guilty, but I have heard no such expressions as that he ought to be hung. I think it is the general opinion by those who live both in the country and the town that he is guilty. I have formed an opinion as to his guilt, but have no personal grudge against defendant growing out of the case, or on any other account. I have prejudged his case; I mean by that, that I have an opinion as to whether or not he is guilty.

J. W. McCowan testified: Have lived in Milam County forty-five years. Live two miles from Cameron. Have heard the case discussed a good deal. As far as I hear, expressions are unfavorable to defendant. Most of the people I have heard speak of the matter condemn defendant. There is a fixed and settled opinion in regard to the case. I live at the bridge over the river near here, and nearly half of the people in the county cross the river there. I see a great many people and hear a great

deal said about this matter. The general opinion is adverse to and condemnatory of defendant. I don't know that any personal prejudice exists against defendant. There is a general sentiment that defendant ought to be punished, and a good many say he ought to be hung. Have never heard a sentiment expressed that does not tend to condemn him.

W. C. Ross testified: Have liven in Cameron nearly fourteen years; know a good many people over the county. Have lived in the county thirty-seven years; was raised in the southwest part, near Davilla. Have heard the case discussed a great deal. As far as I have heard it, the opinion generally is not favorable to defendant. I think it is adverse to him. I can not say that there is any prejudice against defendant growing out of the killing. If to express an opinion before trial is to prejudge the case, then they have prejudged it. The people generally consider him guilty. Regardless of the part of the county they are from, they express themselves adversely to him. The case is not as much discussed now as shortly after the killing. I can not say I know the sentiment throughout the entire county. I meet people from almost all parts of the county, who come to the store and discuss the question. The expressions I have heard are unfavorable to defendant. Know of no personal prejudice growing out of the killing, or from any other cause, against defendant. I think he could get a fair trial in Milam County. I think there are as good men in this county as in any other county; men who would let the case be tried by the law and the evidence. I don't know anybody in the county that don't know something about the case. I have formed an opinion about the guilt or innocence of defendant, but that opinion does not cause me to have a prejudice against defendant. I think defendant could get a fair trial.

Dr. Lyddleton Smith testified: Have lived about ten years in Cameron. Am acquainted at Cameron, Buckholtz, Yarrellton, and have some acquaintances at Maysfield, Ad Hall, and other places in the county. Have heard this case discussed a good deal, but mostly by persons living here in town; have heard several country people talk about it. The sentiment seems to be against defendant; the general opinion is adverse to him. The people with whom I have conversed have generally prejudged this case against defendant. They say he is guilty, and I have heard people say he ought to be hung. So far as I have heard it expressed, this sentiment seems to be general among the poeple. To the question, "Can you say that there is a personal prejudice against the defendant growing out of this affair?" the witness answered, I would call it prejudice. I don't know what you would call it. They condemn the act, and some say he ought to be hung, and some say that he ought to be lynched.

J. P. Evans testified: I live about seven miles from here in the country, in beat No. 2. Have heard the case discussed out there a good deal. The general sentiment in that neighborhood is that defendant is guilty. It is unfavorable to him, and the people are against him. I don't know whether it is prejudice against him growing out of this case, but they are

all against him.  They say he is guilty and ought to be hung.  I think the case is generally prejudged, and the people generally say he ought to be hung.  I think there is a formed opinion as to the guilt or innocence of the defendant.

Ed. Saunders testified: Have lived in Milam County about fourteen years.  Am more or less acquainted all over the county.  Know a good many people.  Have heard this case discussed a good deal, both by the people living in the country and in Cameron.  Have heard it talked about some by the people living here in Cameron.  The general opinion by this discussion, I think, is unfavorable to defendant.  It is condemnatory of the act.  The majority express themselves as believing he is guilty, and condemn him for the act.  I don't know that the opinion of the people is prejudged against defendant.  The majority I have heard speak of it have always said that if the evidence, as they had heard it, and the facts brought out so far were true, they very strongly condemned the act.  I think from expressions, so far as I have heard them, defendant could get a fair trial in this county.  I base this opinion on a sworn hearing, a due regard for his oath, and that he would be governed by the law and the evidence given in the case.  Have heard of no personal prejudice against defendant growing out of this case or otherwise.  I have heard expressions condemning him, but at the same time I don't think there is anything against, only the fact that the people condemn the act.  I suppose the number of jurors in the county are nearly as many as the voters; there are about 5000 voters; probably there are not over 3000 jurors in the county.  I think defendant could get a fair and impartial trial from this number of qualified voters.  I think the matter of the killing is generally known all over the county.  I would have the same degree of prejudice against this man as I would any other who would do the same act, no matter how high a regard I might have had for a man prior to the act.  I know of no prejudice against defendant other than for the act of killing.  The people, I think, simply condemn the act itself.  Don't think there is more antipathy or feeling than would be in any other case of the same character.  Don't think there is anything against defendant other than the mere facts growing out of the supposed killing.  I think if he had not done the act, as sentiment strongly believes, no prejudice would exist against him.  My opinion is, it is the act and not the man they condemn.  By prejudice I mean that people have formed an opinion as to the guilt of defendant.  I know of no personal prejudice against him.

W. B. Streetman testified: Have lived in Cameron forty years.  Have heard this case discussed a good deal, principally here in Cameron; have not heard it discussed through the country.  Have only heard it discussed by country people when I would see them in Cameron.  I don't know that the case has been prejudged by the people.  I have heard some say that he was guilty and ought to be punished; and I have heard others say they were in sympathy with defendant and his family; heard them say they were sorry it happened.  I think the general belief is that he is

guilty. Most of the people I have heard discuss the matter have so expressed themselves about him. The people condemn the act, and I reckon they condemn the man for the act, but I don't think there is any prejudice against him, except that they say he is guilty and that he ought to be punished for it. They say it was a bad act, and that he ought to suffer for it. Don't know the sentiment out of town, and have not heard it discussed but very little of late here in Cameron. Don't know whether there is a prejudice against him in the minds of the country people or not. I think the opinion of the people, so far as I know, is adverse to defendant. Don't think it is any more adverse to him than it would be to anybody else under the same circumstances. Outside of his family, I have never heard anybody express themselves otherwise than that he is guilty. Have heard members of his family say they did not believe he was guilty. I don't consider that there is prejudice against him necessarily growing out of this act. I don't consider prejudice that way. I think prejudice would mean that one would hate a man so that he could not help but convict him, whether he was right or wrong. If the fact that the general sentiment of the people is that they have formed an opinion means prejudice, then there is prejudice. But I do not look at it that way. I draw a distinction between that and prejudice. I do not think there exists against him such a prejudice in the county that he can not get a fair trial here. I think people could be found that would give him a fair trial. I have thought that there was sympathy for him on account of his reputation and family, and that he could get a fairer trial than in another county.

John H. Bickett testified: I am sheriff of this county. There are about 5000 voters in this county, and I would suppose there were 2500 qualified jurors. The county is pretty large. From east to west it is forty or forty-five miles, and from north to south is forty to forty-five miles. Heard the case discussed a good deal in Cameron when the affair first happened, but recently have not heard it discussed so much. Have heard it more discussed in Cameron than anywhere else. Don't remember that I have heard it particularly discussed at Rockdale, but may have heard it mentioned there. Have heard some expressions from different parts of the county, around Buckholtz, Rockdale, and other places, and I think the general opinion is that he is guilty. The conclusion I draw from the talk I have heard is that they regret the act, but they generally say he is guilty. Have been in different parts of the county since this court commenced; have heard some talk about it, but not much. Have been to Milano, Buckholtz, Maysfield, Rockdale, and other places. Have been riding through the country generally. Have heard some expressions, but not a great deal. Don't remember what was said about the case. Have heard some talk here in Cameron since court began, but can not call to mind any particular thing that was said. Don't think there is such a prejudice existing against him as to prevent him from getting a fair and impartial trial in this county. I have generally tried to avoid conversation about it. The most of the expressions I have heard were

to the effect that they regretted the affair on account of his family, and that they have sympathy for him. They have said it was a horrible crime, and that they were sorry for him. Don't know whether the people generally say he did it or not. Have never heard a man express himself otherwise than that he believed Dave guilty. This is his home, and I think the people here feel like he is guilty. Don't think there is any reason for his not getting a fair trial in this county. I know of no one who has any prejudice against defendant; they rather sympathize with him. A good many have opinions as to his guilt or innocence, but no prejudice. A fair and impartial trial could be got in Milam County, and I think there are a number of persons qualified for jury service who have never heard of the case.

James B. Moore testified: Have lived in Milam County about thirty years. For a long time was in drug business; am now in the real estate and insurance. Used to be well acquainted in the country when in the mercantile business; since then my acquaintance has been rather limited. Have heard this case discussed mostly by people here in town, not to any great extent by those who come to town. As far as I have heard, the sentiment of the people is as unfavorable to the defendant as it is to the crime. There is nothing special as to defendant, but the people condemn the crime. A majority in town have expressed themselves that he is guilty, but I can not say as to the country. As far as I know, the sentiment was extremely unfavorable. I don't think any personal prejudice exists against defendant. Have heard some express sympathy for him. I think he could get a fair trial in this county. I have heard two or three express themselves favorable to defendant, but can not now name them. I believe a great many men in the county have not formed an opinion in the case. Have heard several persons from a distance say they had heard none of the particulars about the case. There are good men in the county who, even if they had heard the matter discussed, would be governed by the testimony and the law governing the case when it is put on trial. I believe, from the size of the county and the number of people in it, enough good men who have formed no opinion could be gotten to try the case.

B. I. Arnold testified: Have lived in this county about twenty-four years, and am pretty well acquainted in the county. Have not heard this case discussed much except in town and by people who come to town. Expressions I have heard are generally unfavorable to defendant. The general opinion I have heard was that he was guilty; a contrary opinion was so exceptional as to attract my attention. I can not say that there is any prejudice against defendant growing out of this transaction, nor from any other cause so far as I am informed. I think he might get a fair trial in Milam County." To the question, "Is there any danger that defendant could not get a fair trial in Milam County?" he answered, "That is a little hard for me to answer. Since this occurred I have heard expressions from various people. I have made up my mind that the chances were better for him in this county than in any other. I of

course have heard such expressions as that he was guilty and should be convicted, and the like, but whether or not such expressions as that existing in the minds of the people would prevent him from getting a fair trial, I am not able to answer. Such expressions were mostly from people in town. I have heard very little from the country.

B. M. Briggs testified: Have been living in Cameron eighteen or twenty months; have met a good many people from various parts of the county; have heard this case quite much discussed. I, as far as I know, would construe the sentiment to be unfavorable to defendant growing out of this killing. I can't say I am extensively acquainted, but meet a great many people every day who come to my saloon from different portions of the county,—from Maysfield and other portions. The expressions generally are to the effect that defendant is guilty and that he ought to be punished. I was day and night operator at the depot before I went into the saloon business last November. Saw a good many people at the depot from different parts of the county, but was not, and am not now, very extensively acquainted. I think there is prejudice against defendant growing out of this act.

John C—— testified: Have lived in Milam County about eighteen years. I have been in the saloon business in Cameron about two years. See and am acquainted with people from all parts of the county. Have heard this case discussed a good deal. As far as I have heard it expressed, the general current of opinion is unfavorable to defendant. Can't say the people have generally prejudged his case. The people say that from the way he killed the man, he ought not to have done so; that it was wrong; in other words, that he is guilty. The general sentiment is that they condemn him. The discussions of the case I have heard were in Cameron. There is prejudice against defendant growing out of this killing. Can't say that there would have been any prejudice had it not been for this killing. I have heard no one express a personal prejudice growing out of the killing. I think he could get a fair trial in this county. I base my opinion upon the fact that the people have nothing against him personally, except that they generally condemn the act.

John Womack testified: Have lived about thirteen or fourteen years in Cameron, and some longer in the county. Am in the mercantile business. Know a good many people in the county, especially in the northern part of the county. Have heard the case pretty generally discussed in town; not so much in the country. The expressions I have heard were unfavorable to defendant. I think the people I heard discuss it had prejudged the case; they think he ought to be hung. The general information is that he is guilty. I have not heard anything to the contrary. There is no personal prejudice against defendant growing out of this killing or from any other cause that I know of. I have no prejudice against him. I think there is no such prejudice against him as would prevent his having a fair and impartial trial. For the commission of the crime there seems to be a sentiment against him, but personally I don't think anybody has anything against him, except for the reason

that some of them think that he has committed the crime and ought to be punished for it. They say if he is guilty he ought to be hung. They say if what they heard is true, then he ought to be hung. The opinion that prevails is that he is guilty.

A. J. Lewis testified: Am mayor of Cameron. Have lived in Milam County eighteen or nineteen years. Have been deputy sheriff and sheriff of the county. Five or six years ago knew nearly everybody in the county. Perhaps I don't know some of the newcomers to the county, but I know about all the old settlers. Have heard this case discussed a good deal. I would say the sentiment was unfavorable to defendant. Most that a have heard express themselves seem to think he ought to have his neck broke. My understanding is, they think it is a very horrible crime. There is always more or less prejudice against a man when he commits murder. I don't know that there is any greater prejudice against defendant than would be against any man who would commit a crime of this sort. The expressions generally were, that if he committed the crime he ought to be hung. Have heard a great many people from the country discuss the case since court commenced. As far as I have heard, the generally accepted opinion is that he is guilty and ought to have his neck broke.

J. B. Gilleland testified: I live at Ad Hall, six miles from Cameron. Have heard the case discussed, but not a great deal. Have not been in other parts of the county than Ad Hall and Cameron. Can not say there exists such a feeling as would prevent defendant from getting a fair and impartial trial. Have heard persons say if defendant was guilty he ought to be punished, and I think the general opinion is that he is guilty. Have heard this opinion expressed in my neighborhood and here in Cameron. Have not been over the county much. I know of no personal prejudice against defendant. A number of people have formed opinions and believe him guilty.

W. Hines testified: I am county commissioner. I live five miles west of Cameron. Have heard this case discussed and have read of it in the county papers. Have heard the case discussed more about Cameron than anywhere else. From what I have heard people say, I do not think there is such prejudice against defendant as would prevent him from getting a fair and impartial trial in this county. Have heard some people say he committed the crime, and have heard some say that if he committed the crime he ought to be punished. Don't know of any prejudice against him personally or otherwise than simply the fact of the killing. Don't see any reasonable excuse for his not getting a fair trial in this county. From statements in the newspapers, and what I have heard people say, I think the general sentiment of the people is against defendant; would call it rather unfavorable to him. Don't think I have heard any expression to the contrary but that he was guilty. Know of no prejudice against defendant. Men have formed opinions, and some believe him guilty.

W. H. Spinks testified: Am county commissioner. Live ten miles southeast of Cameron. Have heard this case discussed. Don't think from what I have heard that there exists such prejudice against defendant as would prevent him from getting a fair and impartial trial in this county. Don't know of any prejudice against defendant growing out of the killing, or otherwise, such as would influence anyone in rendering a verdict against him. The general opinion, I think, is unfavorable to defendant. In my part of the county the general opinion is that he is guilty. Those who say he is guilty have no personal prejudice against him so far as I know.

A. E. Clark testified: Am county commissioner. Have heard the case discussed. Have not been over county much. Have been to Buckholtz. Know of no such prejudice as would prevent defendant from getting a fair trial in this county. Don't know of any prejudice other than that the people condemn him for the crime. The expressions I have heard are generally unfavorable to him; the general impression is that he is guilty. Don't know any persons outside his attorneys that do not believe him guilty. Don't see how they could look at it in any other light from reading the papers and hearing it discussed. Most people say if he is guilty he ought to be hung, or rather that he ought to be punished. This is the general opinion. Know of no prejudice against defendant.

O. F. McAnalley testified: Am editor and proprietor of the Cameron Herald. The paper you have is a copy of my paper. The marked paragraphs are said to be a true account of the killing, so far as could be learned. I have about 1500 subscribers for the paper in the county; it circulates all over the county, and is distributed at every postoffice in the county. I have tried to keep up with the case and publish the proceedings for the benefit of my subscribers. Have had the account of the transaction in the paper, and have given the results of the examining trials, and all I could learn about it. The other papers in the county have done so. Don't know what they contained.

Here the account of the killing, as it appeared in the Cameron Herald, in its issue of January 18, 1894, was read.

*W. M. McGregor, Harris & Saunders,* and *Henderson & Streetman,* for appellant.

*Mann Trice,* Assistant Attorney-General, for the State.

HURT, PRESIDING JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of twenty-five years; hence this appeal.

We have read this record very carefully, and have also read the briefs for appellant, and given the same, in connection with the record, a close investigation, and have found but one matter which we deem necessary to discuss at any length.

We are of opinion that the court did not err in refusing to submit the question of manslaughter to the jury, predicated upon the fact that appellant was at a house of prostitution, and was the guest, so called, of the proprietress thereof, and that, when she ordered deceased to leave the premises, he refused to do so, accompanied by insulting conduct, etc.; that this did not constitute a legal provocation to the defendant.

Application was made to change the venue of the case, and issue was formed as the statute requires upon this application. Sixteen witnesses from different sections of the county were examined, and we have carefully read their testimony. Not one but swears that the people, so far as heard from, in that county, believed the defendant was guilty, and ought to be punished; a great many stating that he ought to be hanged. We have never read the testimony in any case, bearing upon such a motion, in which there was more perfect accord in this respect. It is true, some of the witnesses state that they believe the defendant could obtain a fair trial in the county of Milam; but, when the facts sworn to by them are looked to, there is nothing upon which such a conclusion could be based—that is, no legal grounds for such a conclusion. In such a contest a great many men swear that they believe a fair trial could be obtained in the county, but their opinion as to what constitutes a fair trial is frequently at war with principles of law and justice. They believe that a fair trial consists in the conviction and punishment of the accused; and it is often the case that, the more prejudiced the man is against the accused, the more confident is he that the accused can get a fair trial, for in his opinion nothing would be a fair trial which did not result in the conviction and punishment of the accused. Again, it is a startling proposition to a great many that twelve impartial jurors could not be obtained in a county of 5000 voters. They never reflect that the jury is obtained by legal proceedings; and, no doubt, if their attention were called to this, and they thoroughly understood the law regulating the manner in which jurors are obtained and impaneled, they would not give such answers. If the accused were permitted to select his triors, he would not in any cause be likely to move to change the venue. But, as before stated, the jury is obtained and impaneled under the rules of law, and the law providing for a change of venue proceeds upon the hypothesis that the prejudice may be so great and universal in the county as that improper jurors may be obtained, notwithstanding every test may be applied to them. If there were no danger of obtaining prejudiced jurors on the panel, then the law providing for a change of venue upon this ground has no foundation in reason. If obnoxious jurors could be detected and kept from the panel by the questions provided for in the Code, then there would be no reason for a change of venue. But, as above stated, the law providing for the change proceeds upon the assumption that, notwithstanding all tests are made, there may be such a prejudice in the county as will render it probable that an impartial juror might serve. From the manner the witnesses were examined, evidently the learned judge believed that the statute with reference to prej-

udice had reference only to prejudice against the accused, separate and distinct from his crime, or personal prejudice against him, with or without any connection with the crime. We can not comprehend how this proposition can be sound. It would make no difference with the defendant whether he was hanged or sent to the penitentiary because his triors had prejudged his guilt, or had prejudged him as a man. It would be the same to him. The jurors trying the case are sworn to pass upon his guilt, and if they have prejudged the case against him, that judgment must be overcome by the accused; thus throwing the burden of proof upon the accused. A juror may dislike the accused, be prejudiced against him personally, and when he is placed in the box to pass upon his guilt,—independent of whether he likes him or not,—may give him justice. While the statute provides questions to test whether the juror is prejudiced against the accused, or had prejudged his case, we hold that the statute in regard to change of venue embraces both characters of prejudice. As to the correctness of this, we have no doubt. We will extend this discussion no further; stating that we do not feel we can add anything to what has been said in the case of Randle v. State, 34 Texas Criminal Reports, 43. We believe that opinion to be perfectly sound and unanswerable. This case was tried in the court below before the opinion in the Randle case was written. Reversed and remanded.                                    .

*Reversed and remanded.*

The Reporter will report the facts on the motion to change the venue.
HURT, P. J.

June 28, 1898.

HENDERSON, JUDGE (Dissenting).—Having tried the case in the court below, under ordinary circumstances I should hesitate to dissent from my brethren; but believing, as I do, that important legal principles have been violated in this decision, I can not refrain from expressing the reasons for my dissent. The court reversed this case solely on the ground of the refusal of the court below to change the venue, and the decision is predicated upon the rule or construction of our statutes regulating the change of venue, as laid down in the Randle Case, 34 Texas Criminal Reports, 43. The rule there laid down, as I understand it, is that "prejudice," under our statutes relating to the change of venue, means the same thing as "prejudgment;" that is, "prejudice" is defined to be a formation of an opinion as to the guilt of the person to be tried. The presiding judge who wrote the opinion in this case uses this language: "Evidently the learned judge believed that the statute with reference to prejudice had reference to only prejudice against the accused, separate and distinct from his crime, or personal prejudice against him, with or without any connection with the crime. We can not comprehend how this proposition can be sound. It would make no difference with the defendant whether he was hanged or sent to the penitentiary because

his triors had prejudged his guilt, or had prejudged him as a man. It would be the same to him." This is the doctrine of the Randle Case. Before that time such had not been the construction of our statute with reference to the change of venue. That case was rendered before the decision in this case. I have read it carefully, and I can not yield my assent to the doctrine it announces; nor do I believe that the rule stated was necessary to reach the result in that case. I shall first endeavor to show the fallacy in the construction of our statute on the change of venue as laid down in the Randle Case; and I will then show that, even if the rule in the Randle Case be considered as sound, it has no application to the facts in this case. Before I proceed, however, I will state the rule on the question of change of venue as laid down by the authorities of this State, and, so far as I have been able to discover, not gainsaid or controverted by any case: When an application is made for a change of venue on the ground that there exists in the county where the case is being tried so great a prejudice as that the accused can not expect a fair and impartial trial, after issue joined on this proposition the burden is upon the accused to make out his case; and, after hearing the evidence, the decision of the question is largely confided to the discretion of the judge to whom the application is made, and the appellate court will not be warranted in revising the ruling of the lower court unless it be made to appear that such ruling was an abuse of the discretion of the judge, and that the rights of the accused have been prejudiced by his action in the premises. See Myers v. State, 8 Texas Crim. App., 321; Cox v. State, Id., 254; Martin v. State, 21 Texas Crim. App., 1; Bohannon v. State, 14 Texas Crim. App., 271; Noland v. State, 3 Texas Crim. App., 598; Winkfield v. State, 41 Texas, 148. For other authorities, see note to article 615, Willson's Code of Criminal Procedure. To the same effect are the authorities of other States. "The granting of a change of venue on account of the prejudice of the citizens of a certain county against the party to an action is generally discretionary with the court, subject to revision only in case of abuse. The allegation that a fair and impartial trial can not be had must be clearly established, or the venue will not be changed." See 3 Am. and Eng. Enc. of Law (old ed.), p. 96, and notes. It is further held "that the court may deny the motion until it be shown, by an examination of a sufficient number of jurors, whether a fair and impartial trial can be obtained or not; and the fact that a fair jury is obtained is an answer to the affidavit. Id., p. 99.

Now, our article for a change of venue, under which the application was made in this case, reads as follows (article 615, Code Criminal Procedure) : "A change of venue may be granted on the written application of the defendant, supported by his own affidavit and the affidavit of at least two credible persons, residents of the county where the prosecution is instituted, for either of the following causes, the truth and sufficiency of which the court shall determine: (1) That there exists in the county where the prosecution is commenced so great a prejudice against him that he can not obtain a fair and impartial trial. (2) That there-

is a dangerous combination against him instigated by influential persons, by reason of which he can not expect a fair trial." The question here turns upon a proper definition or construction of the term "prejudice," as contained in this statute. It is conceded, in this connection, that the object of a change of venue is to secure a fair and impartial trial; and the right to a change of venue proceeds on the idea that such a fair and impartial trial can not be had in the county, on the ground that so great a prejudice exists against the accused that he can not expect a fair and impartial trial. A majority of the court maintain that "prejudice," here, means the formation of an opinion. I contend that, as contemplated by the statute, it means personal spite or ill will. It is susceptible of either meaning. The question is, what meaning was it intended to have by our lawmakers? To arrive at this intention, I hold that the statutes bearing on the subject of securing to an appellant a fair and impartial trial must be construed in pari materia. Article 616, following this article, authorizes a change of venue when an unsuccessful effort has once been made in any county to procure a jury for the trial of a felony; evidently anticipating that if a jury can not be procured for the trial of a case, because of the formation of opinions, the venue may be changed. And again, as a part of the machinery insuring a defendant a fair and impartial trial, the statute (article 673, Code Criminal Procedure), authorizes a defendant, on certain accounts, to challenge members of the jury. One of the grounds of challenge is that he has a bias or prejudice in favor of or against the accused; and another ground is that, from hearsay or otherwise, there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as will influence his action in finding a verdict. This is a clear and emphatic distinction between prejudice as a ground of challenge to a juror and the formation of an opinion, and tends towards a proper interpretation of the article on change of venue. Our lawmakers, no doubt, had a keen appreciation that there was a distinction between prejudice against the accused, and the mere formation of an opinion 'as to the guilt or innocence of the defendant in a particular case. They provided that, whenever the juror answered that he had a prejudice, no further questions should be asked, but this afforded a ground of challenge. But, when they came to treat of the next subdivision, they provided that the mere formation of an opinion did not constitute a ground of challenge, but that this opinion must be fixed, and in a measure ineradicable. They appear, in this legislation, to have taken accurate observation of the difference between these two conditions of the mind. They realized that the man actuated from prejudice, out of sinister purpose, would be prone to deny that he had such prejudice, and thus get on the jury for the purpose of venting such prejudice, whereas the man who had formed an opinion as to guilt, merely, would exercise no personal prejudice against appellant, but would always be ready to avow that he had an opinion in the case. I am not saying now that a case may not occur of such startling atrocity as not only to create the formation of an opinion

in regard to the guilt or innocence of the party accused of crime, but also to engender a personal prejudice or animosity against such person. There may be, and doubtless have been, such cases; that is, the case itself may be so horrible as to engender a personal prejudice against the person accused of perpetrating it. But this is by no means the general rule; the general rule being that the prejudice does not originate out of the case to be tried, but out of some other matter unconnected with the case; and this character of prejudice is what I understand our statute to contemplate. This construction of the statute gives life and vigor to all of our statutes bearing on the subject, and secures to the accused all that he can demand—a fair and impartial trial. If any other construction is placed upon this statute, the venue, in every case which becomes somewhat notorious in the community where it occurred, can be changed, not on the ground of prejudice, but because people have formed opinions in regard to the guilt or innocence of the defendant. As stated before, there is no lurking danger when jurors have merely formed opinions in the case, because they are ready to avow it. The danger is when they have a private pique or prejudice against the appellant, which they are too ready to conceal for the purpose of getting on the jury. And, as shown above, the court is authorized to change the venue when an unsuccessful attempt has been made to procure a jury.

Concede, however, that the rule laid down in the Randle Case, and followed in this case, is a sound one; yet I insist that it utterly fails to have any application to this case. There were twenty-three witnesses examined on the question of changing the venue, instead of sixteen, as stated in the opinion of the court, and the fullest latitude was allowed by the court in the examination of these witnesses. They were permitted to be fully interrogated as to their own opinions as to the guilt of appellant, and as to the expressions by others of their opinions. Of the twenty-three witnesses, eighteen were from the town of Cameron, where the killing occurred; five only lived out of town,—four of these within a radius of seven miles of the town; and one only lived remote from Cameron. Milam County is a large county, having something over 1000 square miles of territory, and is about forty miles square. Situated within its borders are several considerable towns, and a number of villages. It is thickly populated, the number of voters, as shown by the record, being about 5000; and of this number there are about 2500 qualified jurors. So that at the very threshold we are confronted with the fact that the investigation here made was only partial; the witnesses produced being mostly from Cameron, where the tragedy occurred, and the remote parts of the county not touched by the investigation, except, as some of the witnesses testified, that they came in contact with persons from every section of the county. True, a number of these witnesses testified that they had heard expressions to the effect that appellant was guilty, and that he ought to be hanged. A number—in fact all who were examined upon the question—stated that, in their opinion, they believed appellant could secure a fair and impartial trial in Milam

County. By their testimony it is made evident that not one of the witnesses had any personal pique or prejudice against the appellant, nor did they know of any person who had. On the contrary, it is manifest from their evidence that they each and all felt friendly towards the appellant. They said that he had always stood well in the community, and that his relatives and friends were influential, and several of them stated that on that account they believed he could get a fairer trial in Milam County than any other county. True, some of them said that, if prejudice and prejudgment of the case and the formation of an opinion are the same thing, they had formed opinions as to his guilt. I quote from W. B. Streetman—an intelligent witness—on this question, as follows: "I have lived in Cameron forty years. I have heard the case of the State v. D. H. Meyers discussed a good deal. I have not heard it discussed throughout the country. I have heard it discussed principally here in Cameron. Have heard it discussed by Cameron people pretty generally; and occasionally by a man from the country. I have not heard it discussed by any country people, except when I would see them in Cameron. I don't know that the case has been prejudged by the people. I have heard a good many express themselves, but can not say that I think it has been prejudged. I have heard some say that he is guilty, and that he ought to be punished; and I have heard others say they were in sympathy with the defendant and with his family. I don't know that they expressed only sympathy with his family. I have heard them say they were sorry it had happened. I think the general belief is that he is guilty. The most of the people whom I have heard discuss the matter have so expressed themselves about him. The people condemn the act, and I reckon they condemn the man for the act; but I don't think there is any prejudice against him, except that they say he is guilty, and that he ought to be punished for it. They say it was a bad act, and that he ought to suffer for it. I am not able to say what the sentiment is outside of town here, and really I have not heard it discussed but very little, of late, here in Cameron. I don't know whether there is a prejudice against him in the minds of the country people or not. I think the opinion of the people, so far as I know, is adverse to the defendant. I don't think it is any more adverse to him than it would be to anybody else under the same circumstances. Outside of the family, I never heard anybody express themselves otherwise than that he is guilty. I think I have heard members of his family say they did not believe he was guilty. I don't consider that there is a prejudice against him, necessarily growing out of this act. I don't consider prejudice that way. I don't think 'prejudice' would mean that one would hate a man so that he could not help but convict him, whether he was right or wrong. If the fact that the general sentiment of the people is that they have formed an opinion means prejudice, then there is a prejudice, but I do not look at it that way. I draw a distinction between that and prejudice. I do not think there exists against him such a prejudice in the county that he can not get a fair trial here. I think that people

could be found that would give him a fair trial. I have thought there was a sympathy for him on account of his reputation and family, and that he could get a fairer trial here than in another county." Other witnesses testify to the same effect, but not as strong as Streetman; and it occurs to me that such testimony illustrates the fallacy of the rule laid down in the Randle Case. I have taken pains not only to carefully read the testimony of the witnesses, as contained in the record, in order to refresh my recollection, but I have made a synopsis thereof; and it occurs to me now, as it did then, that appellant entirely failed to discharge the burden imposed upon him by the law, to wit, to show that there existed against him such a prejudice, according to my understanding of prejudice, or such a prejudice according to the rule laid down in the Randle Case, as would deprive him of a fair and impartial trial. In the first place, the investigation was partial, and did not cover the entire county; secondly, the witnesses, each and every one, showed that they had no personal prejudice against appellant, and that they knew of none; thirdly, that, if prejudice meant the formation of an opinion in the case, then appellant's investigation did not show that these opinions were of an acute or fixed character, going to the extent of creating in their minds prejudice against appellant and his cause, and, moreover, did not show that the formation of such opinion was general throughout the county, so as to preclude the reasonability that appellant could get a fair and impartial jury; fourthly, that the general sentiment in Milam County was friendly towards the accused, that he had always stood well, and that he had influential relatives and friends there; and, lastly, the weight of the testimony showed that, notwithstanding the formation of opinions, appellant could get a fair and impartial trial in Milam County. How the court can say, under the facts shown in this record, that there was an abuse of discretion on the part of the trial judge in failing to change the venue, I am at a loss to understand; and yet, in rendering this decision, the court had to say there was a clear abuse of discretion. Moreover, when we look beyond the bill of exceptions with reference to the change of venue, to the result reached in this case, which is authorized, it is evident, and can not be questioned, that a fair and impartial jury was secured. Not only so, but that the jury, under the facts in proof, were exceedingly lenient towards appellant. On the evidence, a verdict of murder in the first degree would be sustained; and yet they gave him only murder in the second degree, with a penalty of twenty-five years.

Recurring to our Reports on a change of venue, a number of cases can be found where the action of the lower court was sustained, in refusing to change the venue, when the proof was far stronger than the proof made in this case. I can not refrain, in this connection, from referring to the case of Harrison v. State (Texas Criminal Appeals), 43 Southwestern Reporter, 1002, which was written by Judge Hurt. In that case the facts are stronger than here. I quote from that opinion the following: "We have read the testimony bearing upon this question, and are

of opinion that there was no error in the action of the court refusing to change the venue. It is true, the sheriff was apprehensive that appellant might be mobbed, called for troops, and the Governor responded, and troops were at court when the trial occurred. This alone is not sufficient cause for a change of venue. If the sheriff had been thoroughly examined, it might have been shown by him, his deputies, or others, that prejudice pervaded the whole county to such an extent as to render it probable that some illegal juror might serve in the case; but this was not shown, and we can not hold that, because the sheriff was apprehensive that appellant was in danger, therefore the prejudice was so general as to require a change of venue. A number of witnesses sworn testified to some prejudice, but the evidence falls far short of showing it to be so general as to require the motion to be granted. We attribute but little weight to the opinion of a witness that an impartial trial can or can not be had in the county of the prosecution. These opinions are to be weighed and considered in proportion to the information of the witness bearing upon the subject. No such combination of influential people was shown as to require a change of venue on this ground."

I have said so much because I feel the court has committed a grievous error in standing by the rule announced in the Randle Case, but, if possible, a more grievous error in extending it to the facts of this case. What I have said is for the purpose of vindicating the law as I understand it. If not now, perhaps it may bear fruit at some future time.

[NOTE.—The State's motion for a rehearing was overruled without a written opinion.—Reporter.]