## GREGORIO CORTEZ v. THE STATE.

### No. 2270.  Decided June 24, 1902.

**1.—Change of Venue.**

See opinion for facts stated on a motion to change the venue, which the court holds showed such a prejudice against defendant, and prejudgment of his case, and also such a combination of influential persons against him in the county, as entitled him to a change of venue.

**2.—Evidence in Rebuttal.**

Evidence offered by defendant which would have been competent to rebut the State's evidence as to ownership of a horse traded to defendant by the witness, will not be admissible as evidence for defendant when the State's evidence as to that matter has been subsequently excluded for incompetency.

**3.—Murder—Evidence as to Mob Violence.**

On a trial for murder, it is not competent for defendant to prove the expressions of the citizens of the county of a desire to mob or lynch defendant, where such expressions were unknown to defendant, and where he could not have been actuated by such expressions in anything he did after the killing which caused the expressions to be made.

**4.—Arrest Without Warrant—Killing of Sheriff—Evidence.**

On a trial for the murder of a sheriff who was endeavoring to arrest defendant without warrant, evidence that deceased had been informed, by a credible person, that defendant was guilty of horse theft and was about to escape, and that the officer did not have time to procure a warrant for his arrest, was incompetent and inadmissible under article 250, Code of Criminal Procedure, in the absence of a direct showing aliunde of the circumstances or conditions under which the sheriff was authorized to arrest defendant without a warrant. Distinguishing Jacobs v. State, 28 Texas Crim. App., 29.

**5.—Same—Notice of Official Character of Officer.**

Where an arrest is sought to be made without warrant, the same rule would apply as in cases of an arrest with a warrant, that is, if the official character of the officer is not known to the party to be arrested, this should be made known and the party should also be informed of the nature and character of the accusation against him.

**6.—Arrest Without Warrant—Evidence.**

Where there was no authority for the arrest of defendant, without warrant, and the method pursued in attempting said arrest was not in accordance with law, and said arrest was illegal, all testimony relating thereto was inadmissible and should have been excluded.

**7.—Resistance to Illegal Arrest—Manslaughter.**

If the authority to make an arrest is wanting, the person attempting such arrest is a trespasser, and the person so attempted to be arrested can resist the attempt regardless of his knowledge that the arrest is illegal, using such force only as is reasonably necessary to prevent the arrest or to free himself from such illegal restraint; and in doing so he is guilty of no offense; but if he uses more force than is reasonably necessary, he would be guilty, at the least, of manslaughter.

**8.—Same—Self-Defense.**

Where deceased, in making an illegal arrest, committed only a simple assault, and defendant was not put in danger, actual or apparent, of life or serious bodily injury by such assault, and defendant resorted, in the first instance, to a deadly weapon and slew deceased, he could not set up self-defense.

**9.—Same.**

If deceased attempted an illegal arrest of defendant and his brother, and defendant drew his pistol merely as a precautionary measure, and not for the purpose of killing deceased, and thereupon deceased drew his pistol and shot defendant's brother and then shot at defendant, whereupon defendant shot and killed him, defendant would be guilty of no offense, for such killing would be in his necessary self-defense.

**10.—Same.**

Where defendant reasonably apprehends that deceased will resort to a deadly weapon in order to accomplish his arrest, he has the right to anticipate him and draw his weapon to prevent being arrested; and if deceased made any demonstration showing an intent to inflict serious bodily harm upon defendant or his brother, then defendant would be authorized to slay him.

**11.—Same.**

If deceased attempted an illegal arrest of defendant or his brother, and before either defendant or his brother made any hostile demonstration, drew a pistol and shot and killed defendant's brother, and then shot at defendant, whereupon defendant shot deceased in order to protect himself, he would not be guilty of any offense.

Appeal from the District Court of Karnes.   Tried below before Hon. James C. Wilson.

Appeal from a conviction of murder in the first degree; penalty, death.

Appellant was charged by the indictment with the murder of W. T. Morris, on the 12th day of June, 1901, by shooting him with a pistol.

This is the second appeal by appellant for killing a sheriff.   See Cortez v. State, 43 Texas Crim. Rep., 375.   The former case grew out of the attempt of the sheriff of Gonzales County to arrest appellant for the murder of Sheriff Morris, for which he was prosecuted in this case. The important facts attendant upon the homicide can be readily seen from the statement in the opinion, and a detailed statement is not necessary.

*Atkinson & Abernathy* and *Samuel Belden, Jr.,* for appellant.—The court erred in overruling the motion of the defendant for a change of venue, the proof showing that the Commissioners Court of Karnes County had offered and paid a reward for the apprehension of defendant for the offense charged in this cause; that influential citizens had also offered and paid a reward for his apprehension; that the county had a small population, and but few qualified jurors; that the deceased (Morris) was sheriff of the county, very popular and widely known; that the newspapers published in the county had all published accounts of the killing, .prejudicial to defendant; that the killing of Morris had been generally discussed; that the general feeling in the county was that defendant was guilty of murder in killing Morris; and that there was such prejudice against defendant as to render it impossible for him to get a fair trial before an impartial jury.

A defendant in a felony case, is entitled to a fair trial before an impartial jury, which have not prejudged his case; and where, as in this case, the fact is developed that defendant's case is prejudged adversely to him, it is the duty of the court to transfer the cause to some county where such prejudice against the defendant does not exist. State Const. Bill of Rights, art. 1, sec. 10; Gallaher v. State, 50 S. W. Rep., 388; Meyers v. State, 46 S. W. Rep., 817; Randle v. State, 34 Texas Crim. Rep., 43; Barnes v. State, 59 S. W. Rep., 882.

In order to make an arrest without warrant legal, it is necessary not only that the officer seeking to make the arrest shall have satisfactory

proof that a felony has been committed, but it must be upon the representation of a credible person, which person or persons must also inform the officer that the offender is about to escape; and the officer must not have time to procure a warrant before acting upon such information. If either of these necessary conditions do not exist, the attempted arrest is illegal, and the acts of the officer in attempting to make an arrest under such circumstances constitute an unlawful assault, which the person he is attempting to arrest may repel and defend himself against. It is immaterial in this case what information Sheriff Morris received in regard to defendant having been guilty of horse theft, as the facts show that he had ample time to have procured a warrant, and that his informant, Sheriff Avant, was in possession of a warrant for the persons described by him to Morris. White's Code Crim. Proc., art. 250; Morris v. Kasling, 79 Texas, 146; Carter v. State, 30 Texas Crim. App., 556.

At the time of the attempted arrest defendant was at home with his family, in his shirtsleeves, not doing anything showing any intention to escape. He was not present at and knew nothing about the conversations mentioned.

In order to justify a person in resisting an apparent illegal arrest, it is not necessary that he should know it to be illegal. In this case there is no evidence going to show that defendant was informed, or had any means of information that the attempted arrest was a legal one; on the contrary, so far as the evidence discloses, he was justified in believing that the attempted arrest was an illegal one, and in resisting the same. The attempted arrest of defendant's brother Romaldo, which was in defendant's presence, was shown by the State's witnesses to have been illegal.

The court erred in that portion of paragraph number 37 of the charge which is as follows: "If, however, you believe beyond a reasonable doubt that although such arrest or attempted arrest, if any, was in fact an illegal arrest as herein explained in this charge, and the defendant knew the same to be an illegal arrest, and he resisted such arrest intentionally, because it was an illegal arrest, and that while resisting such arrest he killed deceased, he could not justify himself under the plea of self-defense, but under such circumstances he would be guilty of manslaughter." As this took from the defendant the right to resist an illegal arrest in the first instance and made the same a crime, and took from him the right to defend himself and his brother from real or apparent danger to their persons, and also made defendant's guilt depend on whether or not he intentionally resisted an unlawful arrest, which our courts have declared an unlawful assault—thus entirely ignoring the issue of self-defense from the attack upon himself and his brother by Morris, as well as the right to defend his property and premises from the trespass being committed by Morris at the time. The charge mentioned is fundamentally wrong in this: The mere killing of an officer while the latter is undertaking an unlawful arrest is not

manslaughter, or any other offense. In order to make such killing unlawful and manslaughter, there must be the existence of sudden passion, arising from the provocation, such as anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection. In the charge complained of the principal ingredient of manslaughter was left out, and the defect not cured by any other portion of the charge. While it is true that defendant was not convicted of manslaughter, yet this charge made it a crime to resist an unlawful arrest under any circumstances, and was bound to influence the jury unfavorably towards defendant's plea of self-defense and justification. White's Crim. Code, art. 698, title, "Manslaughter;" Miers v. State, 34 Texas Crim. Rep., 161.

Express malice apart, if A should use at once, without first resorting to milder means, greater force or violence than was necessary to obtain his liberty, and should kill the officer, he would be guilty of manslaughter; the illegal arrest being a great provocation, the killing would be attributed to the passion arising therefrom. West v. Cabell, 153 U. S., 78, and authorities cited.

In every case in which defendant is held guilty of manslaughter, he used more or greater violence or force than was necessary to prevent the arrest, or regain his liberty. If the accused used no more force than was necessary, he would be guilty of no offense. Miers v. State, 34 Texas Crim. Rep., 187.

The court erred in paragraph 39 of the main charge, in defining defendant's right to resist an attempted illegal arrest of his brother, in that it confined defendant's right to such resistance to his knowledge of the illegality of such attempted arrest; and in not extending such right to defendant's reasonable apprehension and belief as to the illegality thereof. This omission was not cured by any other portion of the charge—the intent and meaning of the charge as a whole being, that in order to reduce the killing of Morris by defendant below murder, the attempted arrest must not only have been illegal, but that defendant must have had actual knowledge of such illegality.

The refusal of the court to give special instruction number 3, requested by defendant, to the effect that defendant would not be guilty of murder in the first degree if he drew his pistol to prevent arrest, whether he thought it legal or not, and did not shoot or attempt to shoot Morris until Morris had drawn his pistol and shot defendant's brother, to save his own life, or to prevent serious bodily injury which might result in his death from an assault by Morris was error. Polk v. State, 30 Texas Crim. App., 657; Carter v. State, 30 Texas Crim. App., 551; Reed v. State, 11 Texas Crim. App., 518.

The court erred in refusing to give in charge to the jury special instruction number 5, requested by defendant, and in not charging upon the issue therein presented. Said charge being to the effect that the proof did not tend to show that Sheriff Morris had received satisfactory proof upon the representation of a credible person that defendant had committed the offense of horse theft, or that he was about to escape; and

it being further shown that Morris was about to arrest defendant without a warrant, such attempted arrest was illegal, and the jury should proceed to consider the case under the law given them upon the issue of illegal arrests only. White's Code Crim. Proc., art. 250; Carter v. State, 30 Texas Crim. App., 556; Newburn v. Durham, 32 S. W. Rep., 112.

The court erred in not giving in charge to the jury special instruction number 6 requested by defendant, and in not charging the jury upon the issue therein presented; said charge in substance instructing the jury that the defendant would be authorized to defend himself from what he had a reasonable belief to be an unlawful arrest; and if the jury believed from the evidence that at the time of the killing of Morris defendant had drawn his pistol for the purpose of defending himself from such anticipated unlawful arrest; that he drew his pistol before Morris drew his; that he made no attempt to use his pistol until Morris drew or attempted to draw his; and that he did not shoot or attempt to shoot Morris until the latter had shot defendant's brother, and was attempting to shoot defendant—then defendant would be guilty of no offense in shooting Morris, and the jury should acquit him.

The court erred in refusing to give in charge to the jury special instruction number 7, requested by defendant, and in not charging upon the phase of the case as therein presented; said requested instruction being in substance that if the jury should find that defendant did, at the time and place charged, shoot and kill W. T. Morris, and that just before such fatal shot, deceased shot at and inflicted serious bodily injury upon defendant's brother, and that by this act of deceased the mind of defendant was rendered incapable of cool reflection, and he thereupon shot and killed deceased, defendant would not be guilty of murder in either the first or second degree, nor of any higher grade of offense than manslaughter.

*J. V. Vandenberg, Bell & Browne,* and *Rob't A. John,* Assistant Attorney-General, for the State.—The fact that a county commissioners court pays a reward for the apprehension of a fugitive from justice, and the further fact that influential citizens or any kind of citizens as for that, supplement the reward for the arrest of one charged with crime, whether it be murder or any other offense, does not necessarily disqualify jurors of that county for trying the accused. The true test is, are there qualified jurors in the county to be had who can give the defendant a fair and impartial trial?

In the light of all the facts proved upon defendant's application and all circumstances surrounding this case, we respectfully submit that defendant has wholly failed to prove that he was entitled to a change of venue. No complaint is made that objectionable jurors were forced upon him, nor a word in all the record to indicate that a jury of unobjectionable men were not had in a reasonably short time. It is submitted that the issue was, did the prejudice exist at the time the

motion for change of venue was submitted? Luttrell v. State, 40 S. W. Rep., 651; Blain v. State, 34 S. W. Rep., 448; ; Howard v. Commonwealth, 26 S. W. Rep., 1. See also Harrison v. State, 43 S. W. Rep., as to character of prejudice that must exist.

It is not permissible to prove by a witness what general talk there is over the country in regard to what is said for or against a defendant; nor is it permissible to ask leading questions of your own witness in this regard.

Witness J. B. Mayfield, defendant's witness, was asked by him the following: "State whether or not in Karnes County, after the killing of W. T. Morris, in your presence and the presence of other citizens of Karnes County, there was any expression made of a desire to mob or lynch the defendant Gregorio Cortez."

The statute authorizes an officer to pursue and arrest without a warrant when informed that the offender is about to escape. Does it mean, as contended by appellant, that the officer or the party so informing him must know that the accused is about to escape? If so, it is a dead letter upon our books, and should be repealed. How is any one to know that the accused is about to escape? You may see the accused get on his horse and ride away; you do not know how far he is going or whether he is going at all. You might see him board a train; you suppose he is going away; but you do not know it until he is gone. And must the officer wait until told that the accused has gone, or must he, in the light of all the facts, decide for himself whether the accused is about to escape? We respectfully contend that the officer must take into consideration the character and habits of the accused, and facts which would authorize him to arrest or attempt the arrest of one person would not authorize him to arrest or attempt the arrest of another. Then, if this be true, if this is what the statute means, let us look for a moment to the facts as they appeared to deceased; and we must assume that the court are human, and know something of the character and habits of men. Mr. Morris, according to the testimony of Mr. Avant, had been for about two months trying to locate the defendant; he is one of the band of horse thieves, according to the information received; he does not know in what county he may be, or where he calls home; he is now informed that he is within a mile of defendant; there is not time to procure a warrant and return by night; Mr. Martin tells him that if he gives Andreas time he (Andreas) will inform defendant, or have him informed that the officers are after him; Andreas is on Mr. Martin's ranch, and he knows his character, and in his judgment any other course than that attempted by deceased will be futile. What must he do? What would any ordinarily prudent man do under like circumstances? It requires no argument to convince any man who knows the character and habits of treacherous Mexicans that Mr. Martin spoke the truth when he told deceased that if he expected ever to arrest defendant and his brother he must proceed at once.

We respectfully submit that the facts justify the officer in the course

attempted, and that the demands of the law which closely guard the rights of her citizens were not infringed upon. Art. 250, Code Crim. Proc.; Miller v. State, 32 Texas Crim. Rep., 319; Jacobs v. State, 28 Texas Crim App., 79; Hill v. State, 37 S. W. Rep., 415.

If deceased had had no information that appellant was about to escape, and in truth if appellant had shown by uncontradicted testimony that he was not about to escape, and was so disabled that he could not escape, then the killing, under the facts of this case, was murder in the first degree.

Defendant's brother Romaldo asked Mr. Morris what he proposed to arrest them for, and when told by the officer that he proposed to arrest them for horse theft, appellant replied, "No man can arrest me," and began pulling his pistol.

Did defendant resist the arrest because it was illegal? Did he ask deceased by what authority he proposed to arrest them? No; he resisted the arrest because, as appellant says, "No man can arrest me." He was at his home with his family and in his shirtsleeves, as appellant's counsel so often put it; but under that shirt was the deadly six-shooter ready and prepared at all times and at all places to resist arrest by any man, as he said. Miller v. State, 31 Texas Crim. Rep., 615; Sherwood v. State, 29 Texas Crim. App., 334; Miller v. State, 20 S. W. Rep., 1103; Mier v. State, 29 S. W. Rep., 1074.

Error is complained of the court's charge upon express and implied malice, upon the theory that there is no evidence to warrant the charge. It would be absurd for us to simply negative the proposition, so we will enter into a short discussion of the facts which in our opinion shows express malice.

When deceased asked for Gregorio, Romalda walked about halfway back to the house, the whole distance being sixty feet, and said to Gregorio that those men wanted him. He did not say they wanted to talk with him, but they wanted him. Is not this a circumstance which shows that Romaldo knew who the sheriff was? Gregorio, with that "farming implement" so usually used by murderers and horse thieves, goes out. Is there deliberation in this preparation? When told by the officer he is going to arrest him, does he ask by what authority? No. He says, "No man can arrest me." Romaldo rushes at deceased. Is not this concerted action, showing a previous understanding between them, and is it not premeditatedly done? Both act in concert, and but for the fact that the deceased was very active and quick to get in line for action he would doubtless have been butchered and shot to death without having inflicted a mark upon his assailants. Defendant, still not satisfied, after the prostrate form of the sheriff lay upon the ground walks deliberately up to him and shoots him again, as he lay there bleeding and dying. But defendant says in his brief his passion was aroused. We grant that; but not for any reasons suggested by defendant, but because the officer of the law had dared to interfere with his work, not "farming" but horse stealing.

It is further shown all through the record in this case that Mr. Morris was a man widely known throughout the county, and that these defendants for some six or eight months had lived in the county. It is hardly possible that these defendants could have lived within ten miles of Karnes City, the home of deceased, in a sparsely settled county of not more than 10,000 inhabitants, and not have known deceased. Again, a very short while after the fight in which deceased was killed, Gregorio said to Romalda, "Be in a hurry; that the sheriffs would come and finish killing them." See testimony of Pedro Garcia. Appellant had seen no one, yet he knew that he had a fight with the sheriff. It is presumed that appellant knew deceased was an officer. 1 Am. and Eng. Enc. of Law, sec. 3, p. 739, and authorities there cited; 12 Id., 2 ed., p. 844.

The fact as to whether a lawful arrest was attempted and as to facts authorizing an arrest without warrant, are questions of fact for the jury; and were properly submitted to the jury by the court's charge. If the defendant did not know the arrest to be illegal, if it was illegal, it would avail him nothing, and the court's charge upon this issue is correct. The fact as to whether the attempted arrest was legal or illegal is a question of fact for the jury, and the charge of the court correctly presented the issue.

HENDERSON, Judge.—Appellant was convicted of murder in the first degree, and his punishment assessed at death; hence this appeal.

Appellant filed a motion to quash the indictment on the ground that, he being a Mexican, members of his race were discriminated against in the organization of the grand jury which returned the indictment. We have examined the proof on that proposition, and the evidence fails to support the motion. We make the same observation with reference to the motion to quash the special venire, which is predicated on the same testimony.

Appellant also filed a motion to change the venue on two grounds; first, that there was so great a prejudice against him in Karnes County as that he could not expect a fair and impartial trial; second, that there existed a dangerous combination in said county, instigated by influential persons, by reason of which he can not expect a fair trial. Both appellant and the State offered evidence on said grounds. Some fifteen witnesses were introduced by appellant and ten for the State. It was shown that W. T. Morris, who was killed by appellant, was the sheriff of Karnes County, and was a popular citizen; and that appellant was a Mexican. It was also in evidence, that a day or two after the homicide, in Karnes County, he was charged with killing the sheriff and constable of Gonzales County; that an account of the killing of these parties was published in the local papers in Karnes County, of which there were three or four; and also in the Express, News and Post, Texas daily papers which had an extensive circulation in Karnes County; that in said publications appellant was charged with the murder of said parties,

and in the local papers appellant was denounced both as a murderer and horse thief, and an account somewhat in detail was given in them of the killing of Sheriff Morris. It is also shown that some five or six hundred dollars was raised by subscription circulated among the citizens of Karnes County for the arrest of appellant for the killing of Morris; a great many citizens in all parts of the county subscribed to said fund, and this was supplemented by one hundred dollars reward, offered by the commissioners of said county for his apprehension. It is shown that, on account of the prominence of the deceased, as also because of the subsequent killing of Sheriff Glover, in Gonzales County, and Constable Snabel, the case was given great notoriety, and was discussed very generally among the citizens of Karnes County. It was also shown that deceased was a member of the Sheriff's Association of Texas, and that sheriffs from other counties, who were members of the association, attended the trial. It was also shown that on appellant's arrest he was not brought back to the county of Karnes, but was carried to jail in Bexar County for safe keeping; and there was some testimony showing some apprerension of mob violence. That immediately on the flight of appellant, posses were raised in the county, who scoured the county as well as adjoining counties in search of appellant. A number of witnesses who were introduced speak of some feeling against appellant immediately after the killing, but state that the feeling had very much subsided. A number of witnesses also state that it was the general opinion that appellant was guilty of killing Morris; and a number say they believe he was criminally guilty, and some of them speak of it in their testimony as a murder. A great majority of the witnesses state, both for appellant as well as the State, that they knew of no prejudice against appellant. Some of these were subscribers to the fund for appellant's apprehension, and some of them belonged to posses engaged in his pursuit; and some of them speak of the case as a murder, but they believed appellant could secure a fair trial in the county. We are bound to gather from this testimony that the case became notorious in Karnes County, and was generally known of and discussed by the citizens of all classes, and that a great majority of those liable to jury service must have formed an opinion as to the guilt or innocence of appellant, and if, as has been held, prejudice and prejudgment amount to the same thing, then, notwithstanding the conclusion drawn by some of the witnesses that no prejudice existed against appellant, we are constrained to believe that what the law terms prejudice, did exist. Randle v. State, 34 Texas Crim. Rep., 43; Gallaher v. State, 40 Texas Crim. Rep., 296; Meyers v. State, 39 Texas Crim. Rep., 500; Faulkner v. State, 43 Texas Crim. Rep., 311, 3 Texas Ct. Rep., 575. We also believe that the evidence tends to show a combination of influential citizens in said county against appellant, which would render it difficult for him to secure a fair and impartial trial there. Some sixty or seventy influential citizens of the county subscribed to a fund to secure his

arrest, and not only so,—the county as a whole through its commissioners court subscribed to the same fund. True, the testimony shows that this fund was not contributed for his conviction, but for his arrest. Ordinarily men do not contribute for the arrest of a man whom they believe innocent, but rather one whom they consider guilty. There is also in the record a suggestion that no lawyer in the county could be procured to defend appellant, but that a number were ready to volunteer to prosecute. We do not propose to criticise the citizens of Karnes County for subscribing to a fund to capture appellant, nor to censure the commissioners court for so doing, nor to find fault with members of the bar who refused to defend him, but were ready to volunteer to prosecute the case against him. These acts may be commendatory in the citizen. At the same time they do not show the existence in that county of a sentiment calculated to guarantee to appellant a fair trial by an impartial jury. Prejudice is a sinister quality; and the very persons whom it actuates may be unconscious of its existence. Hence, no fault is to be found with those who are willing to testify that, in their opinion, there was no such prejudice in the county as to deny appellant a fair trial. Doubtless they believed that a fair trial could have but one result. However that may be, it occurs to us that the evidence here detailed sufficiently indicates not only that there was a wide spread prejudgment of appellant's case in Karnes County, but that there also existed in said county a dangerous combination of influential persons; and we believe that the venue should have been changed on both accounts. What has been said on the question of the change of venue disposes of this case. However, as it is one of grave importance not only to appellant but to the State of Texas, and inasmuch as appellant has assigned a number of errors, some of which we believe are well taken, in view of another trial of the case we believe it proper to discuss them in order that they may not occur again.

Appellant insists that the court erred in refusing to permit him to prove by the witness Villareal that the mare he had traded a horse to defendant for was good property; that she had not been stolen, but had been in that neighborhood for more than a year. In view of the testimony offered by the State, which was evidently introduced for the purpose of showing that said mare was stolen, this testimony was competent. But as will hereafter be seen, the testimony offered by the State on this subject was not competent evidence, and this being excluded, the testimony offered by appellant as to his ownership of the mare will not be admissible.

There was no error in the action of the court refusing to permit appellant to prove by the witness Mayfield, that after the killing of Morris he heard expressions of citizens of Karnes County of a desire to mob or lynch defendant. There is nothing in the record indicating that appellant knew of such expressions, or that he was actuated by such expressions in anything that he did after the killing of Morris.

By assignments of error numbers 8, 9, 10 and 11, he criticises the

action of the court admitting testimony of Sheriff Avant, Gonzales, Villareal and Martin. This evidence was introduced by the State in order to show that deceased (Morris) had been informed by a credible person that appellant was guilty of the theft of horses, and was about to escape, and that the officer did not have time to procure a warrant for his arrest; and that consequently he was authorized to make the arrest of appellant without a warrant. In order to have rendered said testimony admissible, it should have shown the circumstances or conditions under which Sheriff Morris, of Karnes County, was authorized to arrest appellant without a warrant, under article 250, Code of Criminal Procedure. Without reciting this testimony, we would state that it does not show by *satisfactory proof* that appellant and his brother Romaldo, one or both of them, had committed the theft of any person's horse or horses. Sheriff Avant did not know the name of the person he was pursuing, nor was any reasonable description given of him. That he was a medium-sized Mexican, with a big red broad-brimmed Mexican hat, might apply to any number of Mexicans. True, it was ascertained by the sheriff from Villareal that a Mexican by the name of Gregorio had passed that way with some horses about a month before the homicide. But this would not suffice to identify appellant, nor was it shown that he suited the description given. No person is shown to have had any horses stolen, much less that appellant was the guilty party. There was not enough testimony to have authorized an affidavit for the arrest of appellant; nor was it shown that Gregorio Cortez was about to escape, and there was no time to procure a warrant for his arrest. On the contrary, the evidence is to the effect that he was at his home in the county, engaged in making a crop, and that after the sheriff learned of his whereabouts, on the morning of the homicide, he was then within six miles of the justice of the peace, and could have obtained a warrant had he so desired. As stated above, taking this evidence altogether, it did not authorize an arrest without warrant, nor was appellant shown to have any knowledge of the facts related; consequently this evidence should have been excluded by the court, on the same principle that the court would have been required to refuse to admit a defective warrant for the arrest of appellant. This is not like the case of Jacobs v. State, 28 Texas Crim. App., 79, or Cortez v. State, 43 Texas Crim. Rep., 375, which followed the former case. In both of said cases appellants were shown to be fugitives from justice at the time of their attempted arrest; they were thereby charged with notice of the object of the officers in pursuing them. Not so here, as there was absolutely no testimony showing or tending to show that appellant was at the time a fugitive from justice, or was then endeavoring to escape. In regard to the attempted execution of the arrest, it will be observed that the statute does not appear to regulate the mode of arresting without warrant. Reasonably, however, the same rule would apply as in cases of arrest under a warrant; that is, if the official character of the officer is not known to the party to be arrested, this should be made known and

the party also informed of the nature and character of the accusation against him.  There is no evidence that the official character of Sheriff Morris was known to the accused.  He simply informed him that he would arrest him and Romaldo for horse stealing.  We think the sheriff should have disclosed his official character, and that it had been made known to him by satisfactory proof on the part of a credible person, naming him, that appellant and his brother had stolen the horses of some person, and that he arrested them on said account.  Montgomery v. State, 43 Texas Crim. Rep., 304.  So it follows, that there being no authority for the arrest of appellant without warrant, and the method pursued in attempting said arrest not being in accordance with law, said arrest was illegal and all the testimony relating thereto should have been excluded by the court.

In this connection appellant complains of the charge of the court on self-defense, and particularly to subdivisions 36 and 37, which predicate appellant's right of resistance to an unlawful arrest on his knowledge that the attempted arrest was illegal.  Inasmuch as the attempted arrest under the circumstances attending the killing are fully disclosed in the testimony of Boone Choate, who accompanied Sheriff Morris to the scene of the homicide, we will state his testimony substantially on this subject, as follows:  That the sheriff, Trimmell and himself proceeded from Martin's to Thulemeyer's ranch; they left Trimmell at a gate about a half mile from the house at some pens, he getting out of the surrey there.  Morris and himself went to the house where the Mexicans lived; arriving at the house, they stopped at the fence, about sixty feet from the house; they saw two Mexican men and a woman, and some children at the house; they were on the back gallery.  Appellant was sitting on the floor on the back gallery at the left of the door, with his back to the wall.  Romaldo, his brother, was sitting on the gallery, on the steps; he thought the woman was Leona, defendant's wife.  When they drove up, witness said, "Good evening," and they replied, "Good evening," in Spanish.  Romaldo came out to the fence.  When he reached them, witness asked him if Gregorio lived there, and he said, "Yes;" and then told him, "I wanted to see him."  Romaldo turned and walked about halfway back to the steps and spoke to appellant, who immediately got up and came out, Romaldo walking back ahead of him.  Romaldo walked to the line of the fence, and stopped.  Gregorio walked up about ten feet behind Romaldo, and stopped.  Morris then told witness to ask defendant his name, and he answered "Gregorio."  Then told witness to ask him his other name, and defendant said it was "Lira."  Morris then told witness to ask Romaldo his name, and he answered "Romaldo Lira."  Then asked him if they were brothers; and Romaldo answered yes.  Then asked Romaldo, by request of Morris, if he had traded a horse to Andres Villareal about a month before; and he replied no.  Then asked Gregorio if he had traded horses with Villareal, and he answered no.  Then asked appellant if he owned any other horses, and he said

he owned two horses and a mule, and that they were at work on the place, and were his; that he had bought and paid for them. During the conversation Morris and witness were sitting in the front seat of the surrey; no one was in the back seat. · After the conversation was finished, Morris got out of the surrey and stepped over the fence to the right of the two men, and stopped there about twelve feet from them. He then told witness to tell them he was going to arrest both of them, which witness interpreted to them. Romaldo asked, "What for?" Witness replied, under the direction of Morris, "For stealing horses." At this juncture defendant pulled his pistol, and said, "Nobody can arrest me." Romaldo then kind of ran at Morris like he intended to catch him; then Morris pulled his pistol and shot Romaldo. Romaldo was about four or five feet from Morris when Morris fired, and Romaldo fell right at Morris' feet. Morris then turned and shot at defendant, and in a second after that defendant shot at Morris, and Morris commenced to reel and stagger, going down the wire fence towards the gate. Defendant followed him up; Morris fell and defendant ran up and shot him again. Witness further stated, that at the time Morris fired at defendant, defendant had his pistol in his hand bringing it up on a level towards Morris. Upon cross-examination witness stated that Morris shot twice before defendant shot; that he supposed Morris was the quickest man; that appellant began to pull his pistol, and after he had begun to pull his pistol, Morris got his out and shot before defendant got his ready to shoot; that he did not see Romaldo make any effort to draw any arms. Defendant did not ask what they wanted to arrest him for, nor ask for any writ; nor did Morris tell for the theft of what horse he arrested him. When Romaldo advanced on Morris, he was sorter in a stooping or bending position, and was coming directly towards Morris. Did not hear defendant say anything to Morris during the shooting. That after Morris fell, appellant shot at him, and then sorter straightened up and looked around; and at this witness left the place.

On this testimony the court should not have submitted to the jury the issue as to the legality of the arrest, but should have informed them that the attempted arrest of appellant and his brother Romaldo by Morris was illegal. This being true, what were appellant's rights in the premises? This question has been before the courts in this and other States a number of times, and has been much discussed; but the question is still frought with difficulty. Some of the authorities say that an attempted arrest without legal authority, though the want of authority is unknown to the party at the time, if a killing occur in resistance of such arrest, the offense will be of *no higher grade* than manslaughter. Goodman v. State, 4 Texas Crim. App., 349; Ross v. State, 10 Texas Crim. App., 456; Jones v. State, 26 Texas Crim. App., 1; Commonwealth v. Drew, 4 Mass., reported in the Harrigan & Thompson's Cases of Self-defense, p. 705; 1 Bish. Crim. Law, sec. 868; 2 Id., sec. 699, subdivision 2. But in Ex parte Sherwood, 29 Texas Crim. App., 334, and Miller v. State, 31 Texas Crim. Rep., 699, the court expresses itself

to the effect that a killing in resistance of an unlawful arrest is not necessarily no more than manslaughter, but that it may be manslaughter. It was held, "that an attempt to arrest an accused person unlawfully is esteemed a great provocation, and reduces the killing to manslaughter by producing such passion as would render him incapable of cool reflection. We have not held that a killing to prevent an unlawful arrest must of necessity be nothing greater than manslaughter. From the rule other matters become of the greatest importance. There must be an attempt to make the arrest. The attempt must be to make an unlawful arrest; the prisoner must know of the attempt, and he must know that the attempt is to make an unlawful arrest. Why? Because without such knowledge the provocation could have no effect upon him whatever, and hence without such knowledge it is absolutely certain that his passions, if any, were not caused by this provocation." And see Stockton v. State, 25 Texas, 772. We understand from these authorities, that in arriving at a correct conclusion in homicide cases the killing must be viewed from the defendant's standpoint; that is, we must ascertain as nearly as possible from the evidence the reasons or motives which moved or induced the accused to do the killing. The facts and circumstances of every case give character to it; and these may indicate, where the killing is in resistance to an unlawful arrest, that it was murder or manslaughter, as shown by the facts in each particular case. Of course, where the arrest is under legal authority there is only one contingency where such an arrest can be rightly resisted; that is, where the force used to secure it is excessive. But if the authority to make an arrest is wanting, the person attempting such arrest is in the wrong and a trespasser, and the person so arrested can resist him, regardless of his knowledge that the arrest was illegal, using such force only as is reasonably necessary to prevent the arrest or free himself from such illegal restraint. If he use no more force than is reasonably necessary to prevent the arrest' or to free himself from such illegal restraint, he would be guilty of no offense. But if such person in resisting an arrest, or in endeavoring to free himself from an illegal arrest, uses more force than is reasonably necessary, he would be guilty at the least of manslaughter. It would not necessarily follow that his offense would be no more than manslaughter. The excessive force used might be so enormous as to suggest malice; or this, with other circumstances, might suggest a malicious killing. According to the rule laid down in Sherwood's case, the character of the homicide would be determined from the facts and circumstances surrounding it from defendant's standpoint. If, in the attempted arrest, deceased did no more than make a simple assault on appellant and his brother, or attempted to make such assault, and did not use a deadly weapon, and neither appellant nor his brother were put in danger of life or serious bodily injury, actual or apparent, and appellant in the first instance resorted to a deadly weapon and slew deceased, he could not set up self-defense. If Morris attempted an illegal arrest of appel-

lant and his brother, and appellant drew his weapon merely as a precautionary measure, and not for the purpose of killing Morris because he had demanded his arrest, and Morris thereupon drew his pistol and shot Romaldo, and then shot at appellant, and appellant in turn shot and killed Morris, he would be guilty of no offense, for such killing would be in his necessary self-defense. Again, if appellant, from the acts and conduct of Morris in attempting to arrest him and his brother, reasonably apprehended that Morris would resort to a deadly weapon in order to accomplish the arrest, then he had a right to anticipate him and prepare himself by drawing a weapon to prevent being arrested. In such case he would not be required to permit his assailant to take the lead, and thereby give him the advantage, but if the surroundings indicated a resort to a serious or deadly conflict on the part of Morris, he could prepare to meet it; and if Morris then made any demonstration, either upon himself or his brother, showing an intent to inflict serious bodily harm upon either, he would be authorized to slay him. Ross v. State, 10. Texas Crim. App., 465. In this connection we would also refer to the evidence of Leona Cortez, the wife of appellant, who testified that appellant did not pull his pistol and present it at deceased until deceased had drawn his pistol and shot Romaldo. In accordance with this theory, if deceased attempted an illegal arrest of appellant or his brother, and in the first instance, before any hostile demonstration on the part of either defendant or Romaldo, resorted to a deadly weapon and shot and killed Romaldo, and appellant then drew a pistol to protect his brother or himself, and deceased, after shooting Romaldo, shot at appellant, and appellant then shot deceased, and he did so in order to protect himself, in such case he would not be guilty of any offense.

The charges as given by the court on this subject are numbered subdivisions 33 to 37 inclusive. Some of them are not in accord with the views herein expressed. We have not attempted to lay down any form for such charge, but have merely suggested the principles which should govern a charge predicated on the evidence embodied in this record, and as a criterion by which the court should be governed in the subsequent trial of the case, should the evidence be the same. For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*