

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-22-00322-CR

———————————————————

AARON YORK DEAN, Appellant

V.

THE STATE OF TEXAS

_____

On Appeal from the 396th District Court
Tarrant County, Texas
Trial Court No. 1616871D

_____

Before Kerr, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Kerr

**MEMORANDUM OPINION**

In the early morning hours of Saturday, October 12, 2019, Appellant Aaron York Dean—a white Fort Worth Police Officer—shot and killed Atatiana Jefferson, an African American woman, while responding to an open-structure call at her home. A Tarrant County grand jury indicted Dean for murder. Dean twice moved to change venue, first arguing that so great a prejudice existed against him in Tarrant County that he could not obtain a fair and impartial trial and then additionally arguing that a dangerous combination existed against him by influential persons in Tarrant County by reason of which he could not expect a fair trial. The trial court denied both motions.

The case proceeded to trial in December 2022. The trial court charged the jury on murder and the lesser-included offense of manslaughter along with two justification defenses. The jury found Dean guilty of manslaughter and assessed his punishment at 11 years, 10 months, and 12 days in prison. The trial court sentenced him accordingly.

Dean raises four points on appeal: (1) the trial court erred by instructing the jury on the lesser-included offense of manslaughter; (2) the trial court abused its discretion by not changing the trial's venue because there existed a dangerous combination against him by influential persons in Tarrant County; (3) the trial court erred by not changing the trial's venue because the State's controverting affidavits filed in response to his first venue motion were insufficient as a matter of law; and

(4) the trial court erroneously instructed the jury on reasonable belief. Because the trial court did not err or abuse its discretion by not granting Dean's request to change venue and because it did not err in instructing the jury, we will affirm Dean's conviction in this case, with all its levels of tragedy.

## I. Background

Jefferson lived with her then-eight-year-old nephew Z.C. (Zeke)[1] and her mother in Jefferson's mother's house in Fort Worth.[2] In the early morning hours of October 12, 2019, Jefferson and Zeke were playing video games in one of the home's bedrooms. The home's front and side doors were open because Jefferson and Zeke had burned hamburgers earlier that evening and were trying to clear out the smoke.

Around 2:00 a.m., a neighbor saw that the front and side doors to the home were open and that the home's lights were on. The neighbor was concerned and called the Fort Worth Police Department's non-emergency number. Dean and fellow Fort Worth Police Officer Carol Darch were dispatched to the home on an open-structure call.

As Dean and Officer Darch approached the home, they noticed that its front and side doors were open, but the storm doors in those same doorways were closed. They looked inside the house, and both thought that the home appeared to have been

---

[1]We use an alias to refer to Z.C. *See* Tex. R. App. P. 9.10(a)(3).

[2]At the time of the shooting, Jefferson's mother was in the hospital due to poor health.

burglarized. Dean and Officer Darch then went around the side of the home to the backyard. Dean opened the gate to the backyard, entered the backyard, and shined his flashlight around. Officer Darch followed. Neither Dean nor Officer Darch announced their presence.

As Dean entered the backyard, he turned to face the house. Officer Darch followed behind him with her back toward his. Meanwhile, Jefferson heard a noise coming from the backyard. She took a handgun out of her purse and approached a window facing the backyard.

Dean testified that he saw an adult's silhouette in the window. He then yelled, "[P]ut your hands up, show me your hands." He further testified that he saw the barrel of a gun pointed at him and that he fired a single shot at the silhouette as he yelled the commands. Officer Darch heard Dean yelling commands and quickly turned around. As she turned, she heard the shot. She testified that she never saw a firearm pointed out of the window but recalled seeing Jefferson's face with eyes "as big as saucers" through the window. Jefferson died as a result of Dean's shooting her in the torso.

Dean was arrested on October 14, 2019, and a grand jury indicted him for Jefferson's murder just over two months later.

In November 2021, Dean moved to change venue, arguing that there existed so great a prejudice against him in Tarrant County that he could not obtain a fair and impartial trial there. *See* Tex. Code Crim. Proc. Ann. art. 31.03(a)(1). Dean's motion

was supported by his affidavit, along with the affidavits from two Tarrant County residents. The State objected to Dean's venue motion and, in support of that objection, filed three controverting affidavits stating that Dean and the other two affiants were not credible in their claims that Dean could not obtain a fair and impartial trial in Tarrant County.

Judge David C. Hagerman, the then-presiding judge over the case, heard the motion over three days in May 2022. Judge Hagerman found that while the news media's coverage of the incident was pervasive and prejudicial, it was not inflammatory. He denied the motion.

Dean later successfully moved to recuse Judge Hagerman from the case. The presiding judge of the Eighth Administrative Judicial Region then transferred the case to the 396th District Court.

In November 2022, Dean renewed his venue motion with a supplemental motion. In that motion, Dean maintained his argument that there existed so great a prejudice against him in Tarrant County that he could not obtain a fair trial. *See id.* He further alleged that there existed a dangerous combination against him by influential persons in Tarrant County such that he could not expect a fair trial. *See id.* art. 31.03(a)(2).

Judge George Gallagher, the presiding judge of the 396th District Court, heard Dean's supplemental venue motion over two days in mid-November 2022. During the hearing, Dean presented evidence from five witnesses and offered into evidence

media clips and news articles about the shooting. Judge Gallagher deferred his ruling until after jury selection, which began on November 28, 2022. After the jury was seated, the trial court heard arguments from the parties regarding Dean's supplemental venue motion. The trial court denied the motion, and the case proceeded to trial in Tarrant County.

During the charge conference, the State requested that the trial court instruct the jury on the lesser-included offense of manslaughter. Dean objected to its inclusion in the charge on several grounds, but the trial court overruled Dean's objections and instructed the jury on manslaughter.

The charge also included a self-defense instruction. In conjunction with that defense, the trial court defined "reasonable belief" as "a belief that would be held by an ordinary and prudent person in the same circumstances as the actor." Although this definition tracked that found in Section 1.07(a)(42) of the Texas Penal Code, *see* Tex. Penal Code Ann. § 1.07(a)(42), Dean objected to it, arguing that the reasonableness of an accused's belief must be viewed from his viewpoint at the time he acted. The trial court overruled Dean's objection.

The jury found Dean guilty of manslaughter.

Dean has timely appealed. He raises four points, two challenging the trial court's denial of his venue-change motions and two alleging jury-charge error. We address the two venue points first because doing so aids in our disposition of the appeal.

6

## II. Dean's First Venue-Change Motion

In his third point, Dean argues that the trial court erred by denying his first venue-change motion because the State's three controverting affidavits filed in response to his motion were insufficient as a matter of law. Dean contends that all three affidavits were legally deficient because they failed to attack his credibility and that of his fellow affiants or to attack their "means of knowledge" as Texas Code of Criminal Procedure Article 31.04 requires. *See* Tex. Code Crim. Proc. Ann. art. 31.04. Dean acknowledges that his argument is foreclosed by existing Texas Court of Criminal Appeals' precedent—*Burks v. State*, 876 S.W.2d 877 (Tex. Crim. App. 1994), and *Cockrum v. State*, 758 S.W.2d 577 (Tex. Crim. App. 1988)—but presents it to us to preserve it for review by that court. Dean complains that the Court of Criminal Appeals has interpreted Article 31.04 "to impose a much lower requirement for controverting affidavits" that is contrary to the statute's plain language.

The United States and Texas Constitutions guarantee a criminal defendant a fair trial by an impartial jury. *See* U.S. Const. amend. VI; Tex. Const. art. I, § 10. "[W]hen a defendant demonstrates his inability to obtain an impartial jury or a fair trial at the place of venue," a venue change is proper and consistent with due-process principles. *Hathorn v. State*, 848 S.W.2d 101, 109 (Tex. Crim. App. 1992).

Article 31.03(a) of the Texas Code of Criminal Procedure provides that a trial court may grant a change of venue if the defendant establishes that "there exists in the county where the prosecution is commenced so great a prejudice against him that he

7

cannot obtain a fair and impartial trial" or "there is a dangerous combination against him instigated by influential persons, by reason of which he cannot expect a fair trial." Tex. Code Crim. Proc. Ann. art. 31.03(a). A defendant seeking a venue change must file a written motion supported by his own affidavit and the affidavits of at least two credible county residents asserting that the defendant cannot receive a fair trial in that county due to either prejudice or a combination of influential persons against him. *See id.* "If the defendant's motion is proper on its face, he is entitled to a change of venue as a matter of law, unless the State properly challenges the defendant's motion." *Janecka v. State*, 937 S.W.2d 456, 467 (Tex. Crim. App. 1996).

The State may challenge the defendant's motion by attacking the defendant's affiants' credibility or their "means of knowledge" through an "affidavit of a credible person." Tex. Code Crim. Proc. Ann. art. 31.04. "The purpose of [an Article 31.04] controverting affidavit is to provide a form of pleading [that] establishes that there is a factual dispute in need of resolution." *Burks*, 876 S.W.2d at 890. If the controverting affidavit suffices to create a fact issue, the trial court must hold a hearing on the motion. *See* Tex. Code Crim. Proc. Ann. art. 31.04; *Burks*, 876 S.W.2d at 890. But if the controverting affidavit fails on its face to meet either of Article 31.04's requirements, the defendant is entitled to a change of venue as a matter of law. *Janecka*, 937 S.W.2d at 467.

Here, Dean's first venue motion alleged that because of the considerable publicity and extensive media coverage generated by the case, there existed so great a

prejudice against him in Tarrant County that he could not obtain a fair and impartial trial. As Article 31.03 requires, Dean supported these allegations with his own affidavit and two affidavits from Tarrant County residents. The State responded by objecting to Dean's motion and submitting controverting affidavits from three individuals: Reverend William T. Glynn, Michael P. Heiskell, and David Keltner.[3]

Dean contends that all three affidavits are facially insufficient. He asserts that Reverend Glynn's and Heiskell's affidavits are conclusory because neither man explained how Dean and his affiants lacked adequate knowledge or why they lacked credibility. He also faults Reverend Glynn and Heiskell for equating support of Dean's position with bias in his favor. Dean describes Keltner's affidavit as "the least sufficient" of the three because "[i]t wholly omits even conclusory statements about [Dean]'s affiants." Dean further complains that Keltner conclusorily stated that Dean could get a fair trial and "fail[ed] to either challenge the credibility of the affiants or the basis of their opinions."

In *Cockrum*, the Court of Criminal Appeals held that the following affidavit language satisfied Article 31.04:

> My name is _____ and I am a resident of Bowie County, Texas. I have read the affidavits in support of Defendant's Motion for Change of Venue in this cause. The affiants of said affidavits are not credible as they are prejudiced to said Defendant and their means of knowledge are not sufficient to support and justify the statements contained therein.

---

[3]Reverend Glynn is the pastor of Mount Olive Missionary Baptist Church in Fort Worth, and Heiskell and Keltner are practicing Tarrant County attorneys.

9

758 S.W.2d at 582. In *Burks*, the Court of Criminal Appeals noted that the controverting affidavit in that case was identical to the *Cockrum* affidavits' wording and thus held that the affidavit sufficed to create a factual dispute requiring a hearing. 876 S.W.2d at 890.

Here, Reverend Glynn's and Heiskell's affidavits each state their names and that they are Tarrant County residents. Reverend Glynn's affidavit further states in relevant part as follows:

> I have read the affidavits that have been filed in this case in support of the defendant's motion for change of venue. . . . The defendant's affiants are not credible because they are biased in favor of the defendant and lack an adequate means of knowledge to support their statements, including the statements that the defendant cannot obtain a fair and impartial trial.

Heiskell's affidavit has virtually identical language.

The language in Reverend Glynn's and Heiskell's affidavits is substantively identical to that approved by the Court of Criminal Appeals in *Burks and Cockrum. See Burks*, 876 S.W.2d at 890; *Cockrum*, 758 S.W.2d at 582; *see also Busby v. State*, 990 S.W.2d 263, 267 (Tex. Crim. App. 1999) ("Article 31.04 has remained unchanged since *Cockrum* was decided in 1988 and was reaffirmed by *Burks* in 1994. Moreover, the State may well have relied upon our interpretation in *Cockrum* in determining how to proceed on the venue motion. Hence, even if we believed that appellant's interpretation necessarily followed from the language in Article 31.04 (which we do

10

not), we would find that the interests underlying the doctrine of *stare decisis* are weighty enough, in the present case, to adhere to our decision in *Cockrum*.").

We note that as an intermediate appellate court, we cannot reject or alter Court of Criminal Appeals' precedent. *See Wiley v. State*, 112 S.W.3d 173, 175 (Tex. App.—Fort Worth 2003, pet. ref'd). We therefore conclude and hold that under *Burks* and *Cockrum*, Reverend Glynn's and Heiskell's controverting affidavits sufficed under Article 31.04 to advise the trial court that a factual dispute existed requiring the trial court's resolution. *See Burks*, 876 S.W.2d at 890; *Cockrum*, 758 S.W.2d at 582. Because Article 31.04 requires that the State file only one sufficient controverting affidavit, we need not address Keltner's affidavit. *See* Tex. Code Crim. Proc. Ann. art. 31.04 ("The credibility of the *persons* making affidavit for change of venue, or their means of knowledge, may be attacked by *the affidavit* of a credible *person*." (emphases added)); *see also* Tex. R. App. P. 47.1. We overrule Dean's third point.

### III. Dean's Supplemental Venue-Transfer Motion

Dean argues in his second point that the trial court erred by denying his supplemental venue-transfer motion because there was sufficient evidence developed of the existence of a "dangerous combination" of "influential persons" in Tarrant County. *See* Tex. Code Crim. Proc. Ann. art. 31.03(a)(2). Dean contends that the Tarrant County District Attorney's Office, led by then-Tarrant County District Attorney Sharen Wilson, treated this case differently by deviating from office protocol when investigating and prosecuting it. He additionally contends that Betsy Price, the

11

Fort Worth mayor at the time of the shooting, and the then-Interim Police Chief Edwin Kraus made incorrect statements about the case in the days immediately following the shooting that were repeated by Jefferson's family's attorney; by national, state, and local politicians and leaders; and by broadcast and print media. Dean posits that a dangerous combination of people in Tarrant County—namely, Wilson, Price, and Kraus—when mixed with the ongoing, widespread media coverage of this case and "the already inflamed local and national tensions caused by the Amber Guyger trial and [the] George Floyd murder," made it impossible for him to have a fair trial in Tarrant County.[4]

## A. Applicable law and standard of review

As noted, a trial court may grant a defendant's request for a venue change if the defendant establishes that "there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial" or "there is a dangerous combination against him instigated by influential persons, by reason of which he cannot expect a fair trial." *Id.* art. 31.03(a). The

---

[4]In September 2018, Guyger, an off-duty white Dallas police officer, shot Botham Jean, a black man, inside his apartment after mistaking his apartment for hers and him for an intruder. *See Guyger v. State*, No. 05-19-01236-CR, 2021 WL 5356043, at *1–2 (Tex. App.—Dallas Nov. 17, 2021, pet. ref'd) (not designated for publication). Guyger was convicted of Jean's murder. *Id.* at *1. Derek Chauvin, a white Minneapolis police officer, was convicted of murdering George Floyd, a black man, while arresting him in May 2020. *See State v. Chauvin*, 989 N.W.2d 1, 13–15 (Minn. Ct. App. 2023), *review denied* (July 18, 2023), *cert. denied,* 144 S. Ct. 427 (U.S. 2023).

defendant bears the burden to prove either of these bases for a venue change. *See DeBlanc v. State*, 799 S.W.2d 701, 704 (Tex. Crim. App. 1990).

We review a trial court's decision to deny a venue-change request for an abuse of discretion. *Freeman v. State*, 340 S.W.3d 717, 724 (Tex. Crim. App. 2011); *Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007). Under this standard, we defer to the trial court, which is in the best position to resolve issues involving conflicts in testimony and to evaluate witness credibility. *Gonzalez*, 222 S.W.3d at 452. If the trial court's decision is within the zone of reasonable disagreement, we will affirm it. *See Freeman*, 340 S.W.3d at 724; *Gonzalez*, 222 S.W.3d at 449.

**B. Dean's motion and supporting evidence**

Dean supplemented his motion to change venue in November 2022, nearly a year after filing his first venue motion. In his supplemental venue motion, Dean maintained that because of the extensive and prejudicial publicity and media coverage generated by the case, he could not receive a fair and impartial trial in Tarrant County. *See* Tex. Code Crim. Proc. Ann. art. 31.03(a)(1). He additionally argued that he could not expect a fair trial in Tarrant County because influential persons there—namely, Price and Kraus—had instigated a dangerous combination against him by making comments early on that were repeated by the media. *See id.* art. 31.03(a)(2). Specifically, Dean claimed that "[i]n their dangerous combination," Price and Kraus "(1) touted the purported strength of evidence against . . . Dean, (2) made evidentiary representations, (3) discoursed on various prosecution theories, and (4) essentially

13

eliminated any defense available to . . . Dean for the benefit of the prospective jury panel population in Tarrant County."

The trial court heard Dean's supplemental venue-change motion over two days in mid-November 2022. At the hearing, Dean presented testimony from five witnesses—Price; Kraus; Robert Huseman, a former Tarrant County Assistant District Attorney; Fort Worth City Councilmember Chris Nettles; and Dr. Jeanine Galusha, a neuropsychologist—and offered into evidence numerous news articles and media clips related to the shooting.[5]

Kraus testified that he was immediately called to the scene of the shooting in the early morning hours of Saturday, October 12, 2019. He received briefings there from his officers. Huseman—the Chief of the DA's Office's Law Enforcement

---

[5]The bulk of Dean's venue-related evidence was offered and admitted during the hearing on his first venue-change motion. With the majority of that evidence, Judge Hagerman stated that he was admitting it for purposes of that hearing only, and he ruled on the motion before the case was transferred to Judge Gallagher's court. Judge Gallagher stated at the start of the hearing on Dean's supplemental motion that he was "aware that . . . the Defense believed that it had not been able to present all [its] evidence [on the first venue motion], and [he] was going to allow the Defense to continue to present whatever evidence that [it] wanted to present." But at no point did Dean request Judge Gallagher to judicially notice the earlier venue proceedings, and Dean did not re-offer the exhibits from the first hearing into evidence. We therefore consider only the evidence admitted at the hearing on Dean's supplemental venue motion.

Investigation (LEI) team at the time of the shooting—also went to the scene, as was standard protocol.[6]

In Huseman's capacity as LEI team chief, he was the lead investigator and prosecutor in officer-involved shootings in Tarrant County and presented those cases to the grand jury. Wilson requested that Huseman meet with her on October 14, 2019, the Monday morning following the shooting.[7] Huseman and three other DA's Office employees—including the Chief of the Criminal Division—met with Wilson in her office that morning. During the meeting, Wilson asked Huseman and the others to leave the room while she took a call from Kraus on her cell phone, telling them to come back in 15 minutes. When they returned, Wilson had finished the call.

A Fort Worth Police Department detective prepared an arrest-warrant affidavit, and on the evening of October 14, he and Huseman were present when a Tarrant County district court judge signed Dean's arrest warrant. Kraus was not present. Kraus testified that he did not direct any of his officers to prepare Dean's arrest warrant but told them to follow the evidence and "make whatever determination they needed to make." Kraus did not recall speaking to Wilson about the offense before Dean's arrest, but he and Huseman confirmed that it was not unusual for the police department to call the DA's Office to discuss cases.

---

[6]At the time of the hearing, Huseman was no longer employed by the DA's Office and was in private practice.

[7]Wilson was still the DA at the time this case was tried.

Dean was arrested the same day the warrant was signed. Huseman testified that in officer-involved shootings, the DA's Office's routine practice was to present the case to a grand jury before the officer was arrested and that office protocol was that the DA's Office would not make a recommendation to the grand jury in cases in which the officer had not been arrested. To deviate from that policy, an arrest was required. Huseman agreed that Dean's arrest in this case caused a deviation from office policy.

On October 14 and 15, 2019, Kraus and Price, along with Fort Worth City Manager David Cooke, briefed the press on the investigation's status. Before each briefing, Kraus briefed Price. Both Kraus and Price testified that the briefings' purpose was to update the public on the case's status and that they intended to convey correct and accurate information. During the press conferences, Price had stated that a firearm found in Jefferson's home was "irrelevant." Kraus admitted, however, that a few facts were incorrectly presented at the press conferences, notably, that Dean was responding to a welfare check rather than an open-structure call and that Jefferson's having a firearm was irrelevant.

Price testified that the shooting was a tragic situation and was thus an important event in Fort Worth. In her opinion, the case had a racial aspect because it involved a white police officer and an African American female. She admitted that many people in Fort Worth's African American community saw the case as racial, "[b]ut not as a whole. There were a lot of people who didn't see it as racial." Price

agreed that the mayor, chief of police, and district attorney, as well as state senators, state representatives, county commissioners, and United States representatives, were influential people.

Price recalled that Kraus and Cooke had briefed her before the October 14 and 15 press briefings and that Kraus continued to brief her on the case thereafter. She did not recall speaking to Wilson about the case and was not aware of whether her then-chief of staff and current Fort Worth Mayor Mattie Parker had communicated with Wilson.

Huseman testified that the DA's Office presented the case to the grand jury on December 20, 2019. By that time, another prosecutor had been assigned to the case, but Huseman had not been told that he was off the case. That prosecutor and Wilson went into the grand-jury room before the case was presented to the grand jury. Huseman remained in the waiting area outside the grand-jury room and was not in the room when prosecutors presented the case. The grand jury returned a true bill of indictment. After that, Huseman was not involved in the case.

Councilmember Nettles testified that he successfully ran for Fort Worth City Counsel in 2021 on a platform of seeking justice for Jefferson. In June 2021, he hand-delivered a letter addressed to the DA's Office and to the then-presiding judge over Dean's case requesting that they expedite Dean's trial. Councilmember Nettles's visit to the courthouse to deliver the letter, along with the letter's contents, was publicized

17

by the media. Councilmember Nettles further testified that he did not believe that he had a consensus from his fellow city councilmembers regarding those actions.

Lastly, Dean presented testimony from Dr. Galusha, a neuropsychologist who specializes in forensic psychology. She testified regarding the primacy effect, confirmation bias, belief persistence, source-memory error, group polarization, and predecisional distortion. Dr. Galusha explained that these principles had been applied to the impact of pretrial media on jurors, and she opined that the more pretrial publicity that potential jurors hear about a case, the more of an impact that publicity will have on their memories and the more it can increase their bias. She further explained that because of the primacy effect, pretrial publicity might hold more weight with a juror than the evidence presented at trial. She additionally explained that pretrial media publicity could increase the potential for bias in jurors, oftentimes "outside of [their] conscious awareness" such that an instruction to disregard pretrial publicity would be ineffective. Dr. Galusha opined that the publicity in this case seemed to be emotional, which tends to create a stronger memory and bias toward that information; was "largely negative" toward Dean; and was "pretty extensive and pervasive across different platforms." She admitted, however, that she had not studied potential jurors in Tarrant County or the types of media that they had consumed.

The trial court deferred ruling until after jury selection. Two hundred people were summoned for the jury. After no-shows and potential jurors excused by the

18

parties' agreement, 190 potential jurors remained. Of those remaining, 109 indicated that they had "read something, heard something, or seen something about" this case.

The trial court conducted individual voir dire on those 109 potential jurors. Forty-eight of them were excused due to their answers. From the 142 total remaining potential jurors,[8] the trial court was able to seat 12 jurors and two alternates. Of those seated on the jury, only three had indicated that they had heard about Dean's case.[9]

After the jury was seated, the trial court heard arguments on Dean's supplemental venue motion and denied it.

**C. Analysis**

Dean argues that the trial court abused its discretion by not granting his venue-change request because sufficient evidence established that a dangerous combination of influential persons existed in Tarrant County such that he could not expect to receive a fair trial in the county. Dean contends that he met this burden "by showing that the motives of the dangerous combination were widely broadcast in the media to the citizens of Tarrant County." Dean specifically points to the DA's Office's deviation from office protocol and to comments Price and Kraus made at press

---

[8]The trial-court judge's venire list indicated that 143 potential jurors were left after the individual voir dire.

[9]In its brief, the State arrived at the same conclusion: only three of the 12 jurors had indicated to the trial court that they had heard about the case. During oral argument, however, the State informed us that it believed that five of the 12 had heard about the case. But after reviewing the record, we believe that the State's initial calculation was correct.

conferences immediately following the shooting: that Dean was conducting a welfare check rather than responding to an open-structure call at the time of the shooting and that the fact that a handgun was found next to Jefferson's body was "irrelevant."[10] Dean claims that he "was harmed by the circulation of the comments and opinions of the participants in the dangerous combination."

"The basis for sustaining a change of venue challenge based on a dangerous combination 'comes not from a widely held prejudice but from the actions of a small but influential or powerful group who are likely to influence in some manner the way in which the trial proceeds.'" *Ryser v. State*, 453 S.W.3d 17, 36 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (quoting 42 George E. Dix & John M. Schmolesky, *Texas Practice Series: Criminal Practice & Procedure* § 30:11 (3d ed. 2011)). We recognize that Price, Kraus, and Wilson are influential persons, and we recognize that the media's coverage related to the shooting, Jefferson, and the trial continued from the shooting in October 2019 through Dean's trial in December 2022. Even so, Dean did not show that Price, Kraus, and Wilson acted in a way that amounted to a "dangerous combination" so that he could not expect a fair trial in Tarrant County.

---

[10]During the venue hearing, Kraus explained how a welfare check differs from an open-structure call: with "a welfare check, you're going out to see if somebody is okay, to check on the status of that person," but with "[a]n open structure, you're not sure why the structure is open." Because of that difference, the two types of calls are handled differently. Kraus agreed that it would have been erroneous to state that Dean had been dispatched on a welfare check that night.

Dean suggests that his quick arrest after the shooting and the DA's Office's deviation from its standard procedure of presenting an officer-involved-shooting case to a grand jury before an arrest are evidence of a dangerous combination. But Dean's swift arrest and the DA's Office's presentation of his case to the grand jury thereafter do not show a dangerous combination. *Cf. Myers v. State*, 177 S.W. 1167, 1169 (Tex. Crim. App. 1915) (concluding that proof that defendant was promptly arrested, a grand jury reconvened, and the case set for "hearing" five days after indictment showed only that "officials acted promptly in what they considered [to be] the performance of their duty" and not a dangerous combination within the meaning of the statute). Nor does the evidence show that Wilson, Kraus, and Price acted improperly in pursuing Dean's arrest and prosecuting the case. According to Kraus, the officers with the Fort Worth Police Department prepared the arrest warrant but did not do so at his direction. Rather, he "simply directed them to follow the evidence and make whatever determination they needed to make." After that, the DA's Office presented the case to the grand jury. According to Huseman, Dean's arrest before the case was presented to the grand jury would have allowed the DA's Office to deviate from its policy of not making a recommendation to the grand jury in officer-involved-shooting cases.[11]

---

[11]We do not know what happened during the grand-jury proceedings here because grand-jury proceedings are secret. *See generally* Tex. Code Crim. Proc. Ann. arts. 20A.201–.205.

Dean additionally argues that Price's and Kraus's comments to the press in the days following the shooting—specifically, that Dean was conducting a welfare check rather than responding to an open-structure call and that Jefferson's having a gun was irrelevant—which were repeated by other influential persons and the media, were evidence of a "dangerous combination." While these statements may have influenced the views of some, nothing indicates that Price's and Kraus's statements "created a coercive governmental force that could influence the trial proceedings to obtain a conviction without regard to [Dean]'s constitutional right to a fair and impartial jury." *Ryser*, 453 S.W.3d at 36 (citing *Cortez v. State*, 69 S.W. 536, 538 (Tex. Crim. App. 1902)). First, Tarrant County is a large, populous county. *See id.* (noting Harris County's large size in analyzing dangerous-combination argument). Just over half of the potential jurors had heard of the case, and after individual voir dire to ferret out bias created by the media coverage, over 140 potential jurors remained. And although Dr. Galusha testified about the impact of pretrial media on jurors generally, she admitted that she had not studied potential jurors in Tarrant County or the types of media they had consumed. Second, over three years elapsed between Price's and Kraus's statements and Dean's trial. During that time, intervening events occurred that dominated the news cycle and people's lives, namely the COVID-19 pandemic and the 2020 presidential election. *Cf. id.* (noting that the fact that case had been "off the radar" for many months between press conference held by district attorney, mayor, and police chief and the beginning of trial "counsel[ed] against a view that

22

influential people were acting to impede the fair-trial process"). Moreover, as time went on, the media correctly reported that Dean had been dispatched on an open-structure call and also that Zeke had told a forensic interviewer immediately after the shooting that Jefferson had raised her handgun and pointed it at the window.

In sum, although the media coverage in this case was intense and the DA's Office deviated from its standard practices in officer-involved-shooting cases, the trial court could have reasonably concluded that Dean failed to show a dangerous combination against him that was led by influential persons such that he could not expect a fair trial in Tarrant County. *See Buntion v. State*, 482 S.W.3d 58, 73–74 (Tex. Crim. App. 2016) (holding trial court did not abuse its discretion by denying venue motion based on media attention stemming from district attorney's erroneous statement to a newspaper that defendant would be released on "mandatory parole" if he received a life sentence in his capital murder trial where witnesses testified that they were unaware of any dangerous combination and affidavits offered by the defendant in support of the motion contained mere conclusory allegations that the district attorney's false statement prejudiced the defendant and constituted a dangerous combination working to deny him a fair trial). *But cf. Cortez*, 69 S.W. at 538 (concluding that a dangerous combination of influential persons existed where 60 to 70 influential people, along with the county commissioners' court, contributed financially to hunt for and arrest defendant and no local attorney would agree to defend him but many volunteered to prosecute). To the extent that the evidence

could have supported a contrary conclusion, under the governing standard of review we hold that the trial court's decision was within the zone of reasonable disagreement and thus within the trial court's discretion. We overrule Dean's second point.

### IV. The Trial Court's Manslaughter Jury Submission

In his first point, Dean contends that the trial court erred by submitting the lesser-included offense of manslaughter to the jury. He argues that the State should have been required to satisfy both prongs of the so-called *Royster–Rosseau* test[12] that a defendant must meet to prove his entitlement to an instruction on a lesser-included offense: (1) the requested offense is a lesser-included offense of the charged offense and (2) some evidence in the record would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser-included offense. *See Grey*, 298 S.W.3d at 645; *Bullock v. State*, 509 S.W.3d 921, 924–25 (Tex. Crim. App. 2016). Dean acknowledges that under *Grey*, the State—unlike a defendant—need not satisfy the second prong of the *Royster–Rosseau* test when it requests a lesser-included-offense instruction, *see Grey*, 298 S.W.3d at 645, and that we are bound by the Court of Criminal Appeals' precedent. He nevertheless challenges *Grey*'s viability to preserve the argument for presentation to the Court of Criminal Appeals. He alternatively

---

[12]The Court of Criminal Appeals "established a two-pronged test for determining when a trial judge should submit to the jury a lesser-included offense that is requested by the defendant" in the *Royster–Rosseau* line of cases. *Grey v. State*, 298 S.W.3d 644, 645 & n.1 (Tex. Crim. App. 2009); *see also Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex. Crim. App. 1993); *Royster v. State*, 622 S.W.2d 442, 446 (Tex. Crim. App. 1981) (plurality op. on reh'g).

24

contends that *Grey* does not apply here and that *Grey*, as applied, constructively deprived him of notice of the charges against him and violated his due-process and equal-protection rights.

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In reviewing a jury charge, we first determine whether error occurred; if not, our analysis ends. *Id.*

*Grey* instructs that when the State requests the submission of a lesser-included offense, it need not show that "some evidence must exist in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense." 298 S.W.3d at 645 (quoting *Rousseau*, 855 S.W.2d at 673). The requested offense must be merely a lesser-included offense of the charged offense. *See id.*; *see also Bullock*, 509 S.W.3d at 924; *Rousseau*, 855 S.W.2d at 672–73. Here, as Dean concedes, manslaughter is a lesser-included offense of murder, the charged offense. *See Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012). Under *Grey*, the trial court thus properly granted the State's request to include manslaughter in the jury charge.

Dean maintains, however, that *Grey* is inapplicable here because unlike *Grey*, this case does not involve a "neat and tidy lesser[-]included[-]offense scenario" because this case involves self-defense and because the *mens rea* of the lesser-included offense of manslaughter (recklessness) does not fit within the *mens rea* of the charged

25

offense of murder (intentionally or knowingly).[13] The Court of Criminal Appeals'

holding in *Grey* did not turn on the case's facts or the specific lesser-included offense

requested there. 298 S.W.3d at 646–51. Rather, the court analyzed the state of the law

and its precedent related to the submission of lesser-included offenses without

reference to the case's facts. *Id.* In doing so, the court articulated a clear rule: "the

State is not bound by the second prong of the *Royster–Rousseau* test." *Id.* at 645. The

only reference to the case's facts was to illustrate the detrimental consequences of

requiring the State to meet both prongs of the *Royster–Rousseau* test. *Id.* at 650. We are

thus unpersuaded by Dean's attempts to distinguish *Grey*.

Dean further argues that the State's failure to include manslaughter in the

indictment deprived him of notice that he had allegedly committed a reckless act. He

contends that this failure violated his constitutional and statutory rights to notice of

the charges against him.

Both the Texas and United States Constitutions grant criminal defendants the

right to fair notice of the charged offense. *See* U.S. Const. amend. VI; Tex. Const.

art. 1, § 10; *State v. Zuniga*, 512 S.W.3d 902, 906 (Tex. Crim. App. 2017). A charging

---

[13]Dean also asserts that it was improper to submit both murder and manslaughter along with his self-defense and defense-of-third-person defenses to the jury. Justification defenses apply to both murder and manslaughter. *See Alonzo v. State*, 353 S.W.3d 778, 781–82 (Tex. Crim. App. 2011). This is true regardless of whether the State or the defense requested the inclusion of manslaughter in the charge. *Id.* at 780 (noting that determining which party requested the inclusion of manslaughter was "irrelevant for our analysis").

instrument is sufficient if it provides enough notice to allow the accused to prepare a defense. *See Zuniga*, 512 S.W.3d at 906 (citing *Curry v. State*, 30 S.W.3d 394, 398 (Tex. Crim. App. 2000)). "Toward that end, Chapter 21 of the Texas Code of Criminal Procedure governs charging instruments and provides legislative guidance concerning the requirements and adequacy of notice." *Id.* (citing *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004); *Ferguson v. State*, 622 S.W.2d 846, 849–50 (Tex. Crim. App. 1981) (op. on reh'g)).

Dean claims that the indictment—which charged him with murder only—did not provide him with notice that he had acted recklessly because it did not comply with Article 21.15 of the Code of Criminal Procedure. Article 21.15 requires that the State allege the act or acts relied upon to constitute recklessness whenever recklessness is a part or element of the charged offense, or it is charged that the accused acted recklessly in the commission of an offense:

> Whenever recklessness . . . enters into or is a part or element of any offense, or it is charged that the accused acted recklessly . . . in the commission of an offense, the complaint, information, or indictment in order to be sufficient in any such case must allege, with reasonable certainty, the act or acts relied upon to constitute recklessness . . . , and in no event shall it be sufficient to allege merely that the accused, in committing the offense, acted recklessly . . . .

Tex. Code Crim. Proc. Ann. art. 21.15. But Article 21.15 "does not apply in this situation because the indictment [alleged murder but] did not include manslaughter, which was a lesser-included offense" of murder. *Ramos v. State*, 407 S.W.3d 265, 270 (Tex. Crim. App. 2013).

Here, the indictment charged Dean with murder for the shooting death of Jefferson on October 12, 2019. As noted, Article 21.15 did not apply to Dean's indictment because it charged the offense of murder, and it did not include the lesser-included offense of manslaughter or any other offense that implicated recklessness. *See id.* Even so, the indictment "still put [Dean] on notice regarding the specific offense of manslaughter" because he was charged with murder and "the events surrounding the [shooting death of Jefferson on October 12, 2019] were unique." *Id.* at 271. We hold that the State's indictment for murder provided Dean sufficient notice to prepare a defense for the charged offense of murder and the lesser-included offense of manslaughter. *See id.*; *see also Zuniga*, 512 S.W.3d at 906.

Finally, Dean argues that *Grey* "offends due process and equal protection by lowering the burden for the State to obtain a lesser-included instruction while keeping in place a higher burden for a defendant to obtain such an instruction," which "puts the State on more advantageous footing." He asserts that "[a] criminal defendant is entitled to a level playing field" and points out that "[o]ur jurisprudence is replete with examples where due process and equal protection ensure that criminal defendants are not victimized by the prosecution." Dean explains that his defense "was built on his acting intentionally in self-defense" and that "[a]dding a charge after the close of the evidence that lower[ed] the *mens rea . . .* fundamentally alter[ed] the nature" of the charge he had to defend against.

28

In *Grey*, the Court of Criminal Appeals explained the rationale behind, and the justification for, allowing the State to obtain a lesser-included-offense charge without satisfying the second prong of the *Royster–Rousseau* test:

> If the lesser offense is viewed in isolation, a jury's verdict would be rational so long as the lesser offense is included in the charging instrument and supported by legally sufficient evidence. The "guilty-only" prong of the *Royster–Rousseau* test requires, however, that we view the rationality of the lesser offense, not in isolation, but in comparison to the offense described in the charging instrument. But why should we make that comparison? The answer must be that the State is entitled to pursue the charged offense and, therefore, is entitled to receive a response from the jury on whether the defendant is guilty of the charged offense. Is the defendant similarly entitled to a response from the jury on the charged offense? The answer to that question is clearly no. It is the State, not the defendant, that chooses what offense is to be charged. In fact, the State can abandon an element of the charged offense without prior notice and proceed to prosecute a lesser-included offense. If the State can abandon the charged offense in favor of a lesser-included offense, there is no logical reason why the State could not abandon its unqualified pursuit of the charged offense in favor of a qualified pursuit that includes the prosecution of a lesser-included offense in the alternative.
>
> . . . .
>
> The cautious approach for the prosecutor to take would be—or at least should be—to request the lesser-included offense. Allowing submission of lesser offenses when requested by the prosecutor would serve at least two important interests. First, society has an interest in convicting and punishing people who are guilty of crimes. When, in the prosecutor's judgment, submission of the lesser-included offense will enhance the prospects of securing an appropriate criminal conviction for a defendant who is in fact guilty, society's interests are best served by allowing the submission. Second, the prosecutor has "the primary duty . . . not to convict, but to see that justice is done." Even if the prosecutor believes in a given case that he will secure a conviction on the charged offense if the only alternative is acquittal, he might also believe

> that the jury should be given the option to decide whether a conviction on the lesser offense is more appropriate.

*Grey*, 298 S.W.3d at 649–51 (footnotes omitted).

We have recently rejected a complaint that allowing the submission of an uncharged lesser-included offense violated a defendant's due-process rights. *See Villarreal v. State*, No. 02-19-00405-CR, 2021 WL 1323414, at *2–3 (Tex. App.—Fort Worth Apr. 8, 2021, pet. ref'd) (mem. op., not designated for publication). We do so again here. *See id.* And, based on *Grey*'s rationale, we cannot see how including an uncharged lesser-included offense violates a defendant's equal-protection rights. *See Downs v. State*, 244 S.W.3d 511, 518 (Tex. App.—Fort Worth 2007, pet. ref'd) (explaining that to prevail on an equal-protection claim, "the party complaining must establish two elements: (1) the party was treated differently than other similarly situated parties; and (2) the party was treated differently without a rational basis by the government" and that under the first element, "it is axiomatic that the Equal Protection Clause does not require things different in fact be treated in law as though they were the same").

Again, as an intermediate appellate court, we are in no position to reject or alter the precedent of the Court of Criminal Appeals. *See Wiley*, 112 S.W.3d at 175. We are therefore bound by *Grey*'s holdings that "the State can abandon an element of the charged offense without prior notice and proceed to prosecute a lesser-included offense" and that it may do so without showing that a rational jury could find the

defendant guilty of only the lesser offense. 298 S.W.3d at 645, 650–51. The trial court thus did not err by including the lesser-included offense of manslaughter in the jury charge. *See id.*

We overrule Dean's first point.

## V. The Trial Court's Reasonable-Belief Jury Instruction

In his fourth and final point, Dean asserts that the trial court erroneously instructed the jury on "reasonable belief" in conjunction with his self-defense and defense-of-a-third-person defenses. The trial court instructed the jury that "reasonable belief" means "a belief that would be held by an ordinary and prudent person in the same circumstances as the actor." This definition is virtually identical to that in Penal Code Section 1.07(a)(42). *See* Tex. Penal Code Ann. § 1.07(a)(42) ("'Reasonable belief' means a belief that would be held by an ordinary and prudent man in the same circumstances as the actor.").

Dean objected to this definition, pointing out that the self-defense statute uses the phrase "reasonably believes" rather than "reasonable belief" and arguing that the definition of "reasonable belief" would direct "the jury to consider the self-defense issue from the standpoint of a reasonable and prudent person in the same circumstances as the actor" rather than "from the circumstances of the actor alone," which Dean claimed the statute and caselaw require. He thus requested that the trial court instruct the jury that the reasonableness of the defendant's belief should be

viewed from the defendant's viewpoint alone at the time he acted. The trial court overruled Dean's objections and denied his requested instruction.

A trial court must instruct the jury on the law applicable to the case. Tex. Code Crim. Proc. Ann. art. 36.14. The Penal Code provides that deadly force used in self-defense or in defense of another is a defense to prosecution for manslaughter if using that force is "justified." *See* Tex. Penal Code Ann. §§ 9.02 ("It is a defense to prosecution that the conduct in question is justified under this chapter."); 9.31–.33 (setting forth substantive requirements for establishing claim of self-defense or defense of third person). Section 9.31 provides that, subject to certain exceptions, a person is justified in using force against another "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). A person is justified in using deadly force against another if he would be justified in using force against the other under Section 9.31 and, as relevant here, "when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a)(1), (a)(2)(A). Regarding defense of a third person, a person is justified in using deadly force against another to protect a third person if (1) "under the circumstances as the actor reasonably believes them to be, the actor would be justified under" Section 9.32 in using deadly force to protect himself against the unlawful deadly force "he reasonably believes to be threatening the third person he seeks to protect," and

32

(2) "the actor reasonably believes that his intervention is immediately necessary to protect the third person." *Id.* § 9.33.

Dean contends that the reasonable-belief standard in Sections 9.31, 9.32, and 9.33 differs from the definition in Section 1.07(a)(42). According to Dean, the definition of "reasonable belief" in Section 1.07 is "based on the concept of the ordinary and prudent man in the same circumstances as the actor," while self-defense and defense of a third person—which hinge on what the actor "reasonably believes"—are "based on the actor's belief in the situation." In other words, in measuring whether an actor's belief was reasonable in a self-defense or defense-of-a-third-person case, the statute requires that a jury be instructed to assess the reasonableness of the defendant's belief from the defendant's standpoint alone, not from the standpoint of an "ordinary and prudent person in the same situation." We disagree.

First, the fact that Section 1.07 defines "reasonable belief" while Sections 9.31, 9.32, and 9.33 use the phrase "reasonably believes" is of no moment because "[t]he definition of a term in this code applies to each grammatical variation of the term." Tex. Penal Code Ann. § 1.07(b). Second, the Court of Criminal Appeals has expressly stated that "[a] 'reasonable belief' in [the self-defense] context is defined as 'one that would be held by an ordinary and prudent man in the same circumstances as the actor.'" *Braughton v. State*, 569 S.W.3d 592, 606 (Tex. Crim. App. 2018) (quoting Tex. Penal Code Ann. § 1.07(a)(42)). The Court of Criminal Appeals concluded that using

Section 1.07(a)(42)'s definition in the jury instructions correctly instructed the jury on the law of self-defense. *See id.* at 606–07.

We have likewise held that when a defendant asserts self-defense, his rights are fully preserved and the jury charge is proper when it (1) states that a defendant's conduct is justified if he reasonably believed that the deceased was using or attempting to use unlawful deadly force against the defendant, and (2) correctly defines "reasonable belief." *Bundy v. State*, 280 S.W.3d 425, 430 (Tex. App.—Fort Worth 2009, no pet.). We concluded that the correct definition of "reasonable belief" is the definition provided in Section 1.07(a)(42). *See id.* at 430–31. And we are not alone in this conclusion. *See, e.g.*, *Buford v. State*, 606 S.W.3d 363, 371 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (holding that the trial court properly instructed the jury on self-defense and correctly defined "reasonable belief" pursuant to Section 1.07(a)(42), thus instructing the jurors on the law applicable to the case).

We conclude and hold the trial court did not err by including Section 1.07(a)(42)'s definition of "reasonable belief" in conjunction with Dean's self-defense and defense-of-a-third-person defenses and thus correctly instructed the jury on those defenses. We overrule Dean's fourth point.

## VI. Conclusion

Having overruled all four of Dean's points, we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: February 15, 2024